# Illinois Official Reports

## Appellate Court

---

*People v. Simon*, **2014 IL App (1st) 130567**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAMON SIMON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0567 |
| Filed | December 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's denial of leave for defendant to file a successive postconviction petition was affirmed by the appellate court, notwithstanding defendant's contentions that his petition presented a claim of actual innocence founded on an affidavit of a key prosecution witness and that he showed the requisite cause and prejudice for failing to raise several claims with respect to the ineffectiveness of his counsel in his prior pleadings, since no viable claim of actual innocence was set forth in the successive petition and even considering the petition pursuant to the more lenient standard applicable to an initial postconviction petition, the claim of ineffective assistance of counsel lacked any basis. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-20692; the Hon. Frank Zelezinski, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Kathleen Weck, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Damon Simon was convicted of first degree murder for the shooting death of Robert Hill and sentenced to 50 years in the Illinois Department of Corrections. Defendant filed a direct appeal and, while the appeal was pending, filed a *pro se* petition for postconviction relief that was summarily dismissed at the first stage of the proceedings. We affirmed the trial court in both defendant's direct appeal (*People v. Simon*, 2011 IL App (1st) 091197) and in his appeal from the dismissal of his postconviction petition (*People v. Simon*, No. 1-09-2199 (2011) (unpublished order under Supreme Court Rule 23)). Defendant subsequently filed another petition for postconviction relief, raising additional claims, including a claim of actual innocence. The trial court denied defendant leave to file the petition, finding that defendant had not demonstrated the cause and prejudice required for successive postconviction petitions. Defendant appeals, and we affirm.

¶ 2                                    BACKGROUND
¶ 3    The evidence at trial has been described twice before by the appellate court, in our opinion affirming the trial court on direct appeal (*People v. Simon*, 2011 IL App (1st) 091197) and in our order affirming the dismissal of defendant's first postconviction petition (*People v. Simon*, No. 1-09-2199 (2011) (unpublished order under Supreme Court Rule 23)). Those prior orders are incorporated here by reference, and the facts will be described only as needed for the resolution of the issues now before us.

¶ 4                                      I. Trial
¶ 5    On August 14, 2006, defendant was arrested and subsequently indicted for first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) for the July 21, 2006, shooting death of Robert Hill (the victim). In his answer to the State's motion for pretrial discovery, defendant stated

that he would assert the affirmative defense of self-defense. Defendant waived a jury trial and proceeded with a bench trial on November 12, 2008.

¶ 6 During the State's case-in-chief, the State presented four witnesses who testified to the circumstances of the shooting. Aaron Jackson testified that he was attempting to purchase marijuana from defendant, who was sitting in the passenger seat of a vehicle parked in the parking lot of Corona's Food Mart in Calumet Park, when defendant turned to reach behind his seat. Defendant turned around quickly to face forward, looking surprised, and left the vehicle, removing a gun from his waistband. Jackson observed the victim approaching, riding a bicycle in the direction of the vehicle. Defendant walked up to the victim, pointing the gun at him. Jackson heard defendant tell the victim, "talk that shit now," to which the victim responded "what, what," while holding up his hands with his palms facing out; the victim was not holding anything in his hands and appeared surprised. Defendant stood in place and shot the victim twice. After Jackson observed defendant shoot the victim, Jackson "[t]ook off," but heard an additional four gunshots. Jackson later testified that after the shooting, he observed defendant "tak[ing] off" in the vehicle.

¶ 7 Anthony Green testified that approximately five minutes before the shooting, he was standing with defendant in front of the home of the victim's girlfriend, Star Gardner. Green observed the victim come out from the home with a handgun in his back pocket. When defendant observed the gun, he "disappeared." Green ran up to the victim and told him to put the gun away because both the victim and defendant were Green's friends and he did not want to see either killed. The victim then went back to Gardner's home; when he emerged from the home, Green no longer observed the gun.

¶ 8 Green testified that he had observed the victim "pistol-whip" defendant several days before the shooting. Green also testified that he had heard about the victim previously shooting defendant, and when the State objected, the trial court sustained the objection.

¶ 9 After speaking with the victim, Green left to find defendant and went to Corona's Food Mart, located a block from Gardner's home, to purchase a beverage. Green encountered defendant inside the store and they had a conversation as they walked from the store to a vehicle in the parking lot in which a man unknown to Green was sitting in the driver's seat; defendant entered the vehicle. Green spoke to defendant through the vehicle's passenger window when defendant pushed Green back and drew a gun. Green backed up, turned around, and observed the victim on a bicycle. Defendant opened the door, left the vehicle, and fired at the victim while he was on the bicycle. Green testified that once he observed the victim being shot the first time, "it was like, I blanked out."

¶ 10 The State questioned Green about a statement that Green gave to a police detective a few days after the shooting; Green acknowledged making the statement, but could not recall the date because he "[u]sed a lot of drugs." In the statement, Green stated that the victim did not have a weapon and never moved toward defendant. Green testified that while the statement included that assertion, "to be realistic, I didn't know what the hell was going on." He acknowledged that he signed the page and was allowed to make corrections but "I can't barely even read cursive, so I don't know how I can correct something that [the detective] wrote." However, Green admitted that there were several places within the statement where he had made corrections.

¶ 11 Green testified that after the victim was shot, Green was in shock and backed up, leaving the scene. He did not observe defendant entering the vehicle and leaving. The State read from

Green's statement that Green was attempting to leave the scene when he observed defendant in a vehicle and heard defendant yell "GDK," which Green knew to mean "Gangster Disciple killer." After hearing the statement, Green testified that defendant "jumped in the car[, rode] past and said it to me, GDK." Green later testified that the yell could have come from defendant or from another member of the Black P Stones named Mooney[1] who was nearby. Green testified that he was a Gangster Disciple with the victim, but that there were no other Gangster Disciples in the area of the shooting. Green later testified that there were people near the victim when he was riding his bicycle toward defendant, and the people were the same ones who had been present when the victim had pistol-whipped defendant.

¶ 12    Green testified that he observed defendant shooting the victim once, after which "it was over for me." The State read from Green's statement that once defendant shot the victim once or twice, the victim "went down," and defendant stood over the victim, shooting him "maybe five or six or seven times altogether." During cross-examination, the defense questioned Green about the assertion in the statement, and Green testified that the statement could not be true because the gun could not have held that many bullets. Green further testified that the detective taking his statement did not write down "the majority of what the truth was or what I had to say," but admitted that most of the assertions in the statement were true; while still under cross-examination, Green later testified that the assertions in the statement were not true but then admitted during redirect examination that he had reviewed the statement shortly before trial and told the State's Attorney the statement was true. During cross-examination, Green testified that he was considered a suspect at the time he gave his statement to police and heard the detective's account of what had occurred prior to giving his statement. He testified that he signed the statement because he was in fear of being sent to jail and that he had been in the holding cell of the Calumet Park police department for three days without being given food or water before signing the statement. Green also testified that he was unable to read the majority of the statement.

¶ 13    After Green's testimony, the State called Eric Celauro, a former assistant State's Attorney who worked in the Cook County State's Attorney's office on July 25, 2006, to testify about his interview with Green and the circumstances under which the statement was obtained. Celauro was contacted by two detectives from the Calumet Park police department about interviewing Green. The interview took place in the State's Attorney's office and Celauro, Green, and the two detectives were present. Celauro informed Green that he could either write a statement himself or Celauro could write it for him, after which Green would check it for accuracy. Green requested Celauro to write the statement. The State then asked to publish the statement, and defense counsel objected. The court allowed the statement to be admitted into evidence and published, both for purposes of impeachment and substantively.

¶ 14    In the statement, Green said that on the day of the shooting, he observed the victim leaving his girlfriend's house and further observed the handle of a gun protruding from the victim's back pocket. Since Green knew the victim well, he told the victim to "cool out" and put the gun away because there were children nearby. At the time, defendant was outside, one building away, and at some point, defendant went inside.

---

[1]The original appellate record did not identify Mooney. However, Green's affidavit, submitted with defendant's successive postconviction petition, identifies Mooney as Aaron Jackson.

¶ 15    A short time later, as Green left Corona's Food Mart after a brief visit, he observed defendant sitting in the passenger seat of the vehicle and walked over and spoke with defendant. Green observed a handgun in defendant's lap. Defendant looked around Green "like he saw someone," and Green turned and observed the victim on a bicycle. Defendant pushed Green away and exited the vehicle. Defendant was a few feet from the victim and walked toward him with a pointed gun. Green did not observe the victim with a weapon and the victim never moved toward defendant. The victim attempted to get off of his bicycle as defendant "got right up on him" and said something like, "what's that shit you was talking about." The victim laid his bicycle on the ground and stood with his hands in the air, saying something like, "are you going to do this in broad daylight," and partially turned his back on defendant.

¶ 16    Defendant began shooting the victim from a foot or two away. After the first or second shot, the victim "went down" and defendant stood over him and continued shooting "maybe five or six or seven times altogether." Green said that at some point, Jackson or someone named Mooney[2] had ridden in on a bicycle and observed the scene as well. Green attempted to walk away from the scene and observed defendant "jump" into the vehicle and drive away, yelling "GDK" from the vehicle, which meant "Gangster Disciple killer."

¶ 17    Also in response to Green's testimony, the State called as a witness Dan Maloney, an assistant Cook County State's Attorney who was a witness to a conversation between one of the prosecutors, Shital Thakkar, and Green on November 12, 2008, during defendant's trial. Maloney testified that Green did not want to be involved and did not know why he was "locked up," after which Thakkar explained to Green that he was arrested and held pending his testimony at trial due to a warrant issued after he did not appear in court after being subpoenaed. Thakkar told Green that he would review Green's statement with him and, if something was untrue, Green should inform Thakkar. Thakkar took Green's handwritten statement and read it to Green, asking every few sentences if the statement was true; Green responded to each question that the statement was true. Green began laughing when Thakkar read the assertion regarding defendant yelling "GDK" and said something to the effect of "it was just funny; I can't believe he said that"; Green acknowledged remembering the incident.

¶ 18    The State additionally called Antrelle Clayborn as a witness, who testified that on July 21, 2006, he was driving his automobile when he received a cell call from defendant. Defendant told Clayborn that he had just observed Clayborn driving down the street and asked Clayborn to pick him up in the alley behind defendant's house. Clayborn complied and defendant entered Clayborn's vehicle with a 40-ounce beer and began talking about an incident that had occurred between defendant and someone else. Clayton also stated that "[defendant] said it was somebody on the front that he thought had a gun who was going to shoot him," but the court sustained the State's objection on hearsay grounds.

¶ 19    Defendant asked Clayborn to drive to Corona's Food Mart. Clayborn parked the vehicle and defendant exited the vehicle and entered the store while Clayborn waited. Defendant exited the store four or five minutes later and entered the vehicle. Anthony Green walked up to the passenger side of the vehicle and spoke with Clayborn.

¶ 20    Clayborn testified that the victim came "riding up" on his bicycle, not riding at a fast speed, and was riding toward the store, which was in the same direction as the vehicle; Clayborn

_____

[2]As noted, in his affidavit, Green now states that Jackson and Mooney are the same person.

opined that "[h]e wasn't never close to us or nothing." The victim was alone when he entered the parking lot.

¶ 21    Clayborn testified that defendant lifted his shirt and Clayborn observed the handle of a handgun in defendant's waistband and defendant told Green to move out of the way so that defendant could open the door. Defendant jumped out of the vehicle while pulling out his gun, "said a few words" that Clayborn was unable to hear, and shot the victim while he was still on his bicycle. Clayborn was able to see both of the victim's hands when he was riding up to the store and testified that both of his hands were on the handlebars of the bicycle and he was not holding anything else; Clayborn further testified that the victim's hands never left the handlebars.

¶ 22    Clayborn was preparing to leave after the shooting when defendant opened the door and jumped into the vehicle. Defendant told Clayborn that the victim " 'had to get it.' "

¶ 23    The State also called Mohammed Suleiman as a witness. Suleiman was working at Corona's Food Mart on the day of the shooting and observed defendant enter the store, make a purchase, and leave. Defendant entered a vehicle, sitting on the passenger side. A man named Yale was standing near the passenger side door of the vehicle. Suleiman was sweeping the rug near the store's glass front door and observed the victim riding on his bicycle alone, coming from the opposite side of the parking lot. The victim did not have a gun in his hand and Suleiman did not observe the victim reaching for his waistband; while he was riding his bicycle, the victim's hands were on the handlebars.

¶ 24    Suleiman turned around to roll up the store's rug and heard several shots. He turned back and observed the victim on the ground and defendant entering the vehicle and leaving. Suleiman noticed a gun in defendant's hand. Suleiman testified that he never actually saw defendant shoot the victim because by the time he turned around, defendant was running toward the vehicle. Suleiman was able to see the victim lying on the ground with blood "all over his shirt" while he was calling police. No one approached the victim or took anything from him. Suleiman observed the fallen victim until the police arrived within a matter of seconds.

¶ 25    The State also called a Calumet Park police officer as a witness who testified that there was no weapon recovered from the scene.

¶ 26    After presenting its witnesses, the State made an oral motion *in limine* to bar on the basis of hearsay Star Gardner's anticipated testimony that the victim told her that he had previously "slapped the defendant around." The trial court granted the motion *in limine* to bar that statement.

¶ 27    The parties stipulated that Dr. Nancy Jones, a forensic pathologist with the Cook County medical examiner's office, would testify that she performed a postmortem examination of the victim on July 22, 2006, in which she found a "through-and-through" gunshot wound to the victim's lateral chest, which she classified as an entrance wound. There were also three gunshot wounds to the left back, from which medium-caliber, partially copper-jacketed, lead bullets were recovered. None of the gunshot wounds included evidence of close-range fire. Dr. Jones would further opine that the cause of the victim's death was multiple gunshot wounds and the manner of death was homicide.

¶ 28 The parties also stipulated that Illinois State Police forensic scientist William Anselme would testify that the three bullets were fired from the same firearm. The parties further stipulated to the fact that defendant was arrested with probable cause on August 14, 2006.

¶ 29 In his case-in-chief, defendant called Patricia Simms to testify on his behalf. Simms was visiting her daughter on July 21, 2006, when defendant knocked on the door. After defense counsel asked Simms what happened when she answered the door, the State objected and the trial court sustained the objection.

¶ 30 Prior to defendant knocking on the door, Simms had observed the victim and another man called Yayo outside. Simms answered the door and defendant asked if he could come in. The State objected and the court sustained the objection, instructing Simms: "Ma'am, you can't testify as to anything that he told you." Simms testified that defendant appeared scared. He made a telephone call for someone to pick him up and left through the back door; defendant was in the house for less than five minutes.

¶ 31 Defendant also testified on his own behalf. On July 21, 2006, defendant was walking down the street with Green when the victim came out of an apartment. Defendant observed a pistol in the victim's back pocket. The victim was approximately 10 feet from defendant and told defendant, " 'I got you now; I'm going to kill you.' " Green told the victim, " 'Man, hold on. Man, you don't need to be doing this out here.' "

¶ 32 Defendant testified that it was not the first occasion in which the victim had threatened him with the same gun. Approximately two or three days earlier, defendant was with Green when the victim and three of his friends approached. The victim told defendant that "he didn't want to see [defendant] around there no more." The victim's friends held defendant down and the victim "pistol-whipped" defendant, hitting him across the head several times with the butt of the gun. Green told them to stop and ran away. Defendant did not have a gun during the incident and thought that the victim was going to kill him.

¶ 33 On July 21, when the victim threatened to kill defendant, defendant did not have a gun. After the victim threatened him, defendant testified that "I felt he was going to kill me. I was in fear of my life. He said he was going to kill me. He said he was going to kill me. I was in fear of my life." Defendant ran next door to Simms' house and "asked her please let me come in the house 'cause somebody out there got a gun; he talking about he gonna kill me." Simms opened the door and allowed defendant to come inside. Defendant observed Clayborn driving past the window and called him to ask him to pick defendant up. At the time, the victim was still in front talking with Green. When Clayborn arrived, defendant ran to his vehicle and they drove away. Clayborn asked defendant why he was running out of the back door of Simms' house, and defendant told him " 'This guy in the front, he got a gun, man; he just told me he gonna kill me, man, just get me away from the area.' "

¶ 34 They stopped at the store and both went inside, where defendant purchased potato chips. Defendant did not have a gun when he went into the store, nor did he have a gun at Simms' house or when exiting the store. When they came out, defendant jumped into the passenger seat. Green was walking past and stopped at the passenger side of the vehicle, where he said that he wanted a ride to work. Clayborn told Green that he could not have a ride unless he had money for gas. While they were talking, defendant looked to the right and saw the victim approaching on a bicycle at a fast pace toward the vehicle with some friends following him on foot; defendant testified that the friends were the same three friends as in the pistol-whipping incident.

¶ 35       Defendant had been leaning back in the passenger seat and when he turned, he and the victim caught each other's attention. Defendant testified that "[o]ur face[s] saw each other, and I just–he just pointed at me and I looked back at [Clayborn] and I told him, man, we got to go, man, this is the same guy that just had a gun on me." Defendant first noticed the victim when he was 30 to 35 feet away and the victim rode his bicycle to within a few feet of the passenger side of the vehicle. While the victim was riding his bicycle, defendant observed him reach into his back pocket, where defendant had previously seen his gun. The victim dismounted the bicycle and pulled his gun, stating " 'I got you now,' " and Clayborn passed defendant a gun. Defendant did not have a gun before that time, and the gun that Clayborn passed to him did not belong to defendant; defendant did not know whether the gun was loaded.

¶ 36       Defendant exited the vehicle; he testified that he was "trapped." The victim pointed his gun at defendant and said that he was going to kill him. Defendant fired his gun because he was afraid that the victim would kill him; he did not know how many times he shot the victim, but "just kn[e]w the gun went off." Defendant testified that he never shot the victim in the back. The victim did not fire his gun. Defendant then entered the vehicle and Clayborn drove away; defendant did not say anything after the shooting. Defendant was scared after the shooting and did not know what to do. Defendant did not tell Clayborn to drive away, did not force Clayborn to drive him to Clayborn's family's house, and did not ask anyone to dispose of the gun because the gun was not his.

¶ 37       Defendant testified that he had only a few interactions with the victim over several years and did not know him very well, but that "[f]or some reason," the victim did not like him. Defendant also testified that the victim robbed him several years ago. However, defendant testified that "I ain't wanna kill him. I ain't have no plans on seeking no revenge on him." Defendant testified that he was defending himself.

¶ 38       After defendant testified, the defense rested its case-in-chief and the parties presented their closing arguments. The court found that both sides agreed that defendant was the person who killed the victim and that the only question was whether he was justified in doing so by acting in self-defense. The court found that defendant and the victim had "history behind them," including defendant's testimony that the victim robbed and pistol-whipped defendant. However, the history did not justify the shooting. The court found that accepting defendant's testimony would result in a finding that the shooting was justified by self-defense but noted that other testimony needed to be considered as well. After recounting the other witnesses' testimony, the court concluded that it did not accept defendant's testimony and did not find it credible, including a consideration of second degree murder:

> "Defense testimony I heard, and I listened very deeply to find if he acted in self-defense or even unreasonably acted in self-defense. I do not accept the defendant's testimony. I do not find it credible, and on that basis I believe the State has established their burden here."

The court found defendant guilty beyond a reasonable doubt of first degree murder.

¶ 39       On May 4, 2009, the parties came before the trial court for sentencing and defendant's posttrial motion for a new trial. The court denied the motion for a new trial and sentenced defendant to 50 years in the Illinois Department of Corrections. Defendant filed a notice of appeal the same day.

¶ 40                                    II. Direct Appeal and Postconviction Petition

¶ 41        On direct appeal, defendant argued that his conviction should be reduced to second degree murder and remanded for resentencing because he acted with an actual, though unreasonable, belief in self-defense. Alternatively, defendant claimed that he was entitled to a new trial because: (1) the trial court erred in barring evidence that supported defendant's theory of self-defense, (2) the trial court relied on an erroneous recollection of the evidence in weighing witness credibility, and (3) the State failed to disclose a witness's felony conviction and allowed the witness to provide perjured testimony when it failed to correct the witness's misstatement of his criminal history. We affirmed defendant's conviction. *Simon*, 2011 IL App (1st) 091197.

¶ 42        On June 12, 2009, 39 days after sentencing, defendant filed a *pro se* petition for postconviction relief. In the petition, defendant raised a number of arguments, including the claim that his trial counsel was ineffective for (1) filing a posttrial motion without reviewing trial transcripts after requesting that defendant pay additional funds to obtain the transcripts and (2) failing to argue for second degree murder despite defendant's specific request for him to do so. On the same day, defendant filed a *pro se* posttrial motion to reconsider his sentence. On June 19, 2009, defendant filed a *pro se* posttrial motion to convert the petition for postconviction relief into a motion for a new trial. On July 10, 2009, the trial court denied defendant's motion for a new trial and his motion to reconsider his sentence "for untimeliness and for lack of jurisdiction due to a notice of appeal being filed." The court further denied defendant's postconviction petition, finding it to be frivolous and patently without merit. Defendant appealed the denial of his postconviction petition, and we affirmed. *Simon*, No. 1-09-2199.


¶ 43                                    III. Successive Postconviction Petition

¶ 44        On October 16, 2012, defendant filed a petition for leave to file a successive postconviction petition. Defendant claimed that there was cause for his failure to raise all claims in his initial postconviction petition in that the initial petition "was intended as a post-trial motion, and only labeled as a post-conviction petition after Petitioner was misguided to do so by a jail-house lawyer." Defendant further claimed that without leave to file the successive petition, he would be "effectively denied the right to present constitutional claims of a serious magnitude, including allegations of ineffective assistance of counsel."

¶ 45        In the successive postconviction petition, defendant raised a number of ways in which he claimed his trial counsel was ineffective. Additionally, defendant claimed he had new evidence that he acted in self-defense and therefore was actually innocent of first degree murder. In support of his claim, defendant attached the affidavit of Anthony Green, who testified on behalf of the State at defendant's trial. In his affidavit, Green stated that on the day of the shooting, the victim approached defendant in the parking lot on his bicycle and was accompanied by the same friends who pistol-whipped defendant two days prior to the shooting. Green further stated that the victim had a gun and told defendant that he would kill defendant. Green stated that Aaron Jackson, not defendant, yelled "GDK" and that one of the victim's friends removed the victim's gun from the scene. Green stated that the reason he did not come forward with this information earlier was that he was "scared" and that the police "said they [were going to] lock me up for accessory to murder if I didn't make the statement in which when I did make a statement they used what they wanted to use." Green further stated

that "the reason I didn't clear it up at [defendant's] trial[ ] was because the State threatened to lock me up longer if I didn't cooperate with them[.] I didn't want to be locked up any longer[.] I was told what to say so I said it[.] I just wanted to get it over with and go home[,] not even thinking about what will happen to [defendant]."

¶ 46   On January 18, 2013, the trial court denied defendant leave to file his successive postconviction petition, finding that defendant "fail[ed] to meet the cause and prejudice test that is necessary for the Court to allow him to file a successive petition." This appeal follows.

¶ 47                               ANALYSIS

¶ 48   On appeal, defendant argues that he should have been granted leave to file a successive postconviction petition because (1) he presented a claim of actual innocence based on the affidavit of Green, a "key State witness"; and (2) he demonstrated cause and prejudice for his failure to previously raise several meritorious claims concerning trial counsel's ineffectiveness.

¶ 49                 I. Successive Postconviction Petitions

¶ 50   A postconviction proceeding is a collateral proceeding, as opposed to a direct appeal of the underlying judgment. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). The purpose of the postconviction process is to permit review of constitutional issues that were not, and could not have been, reviewed on direct appeal. *Ortiz*, 235 Ill. 2d at 328. Thus, issues that could have been or were raised on direct appeal or a prior petition are generally considered waived, for purposes of the postconviction process. See *Ortiz*, 235 Ill. 2d at 328. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)) generally contemplates that a defendant will file only one postconviction petition. *Ortiz*, 235 Ill. 2d at 328.

¶ 51   However, there are two ways to overcome the procedural bar to filing a successive petition: (1) the *Pitsonbarger* cause-and-prejudice test; and (2) the *Ortiz* actual innocence test. *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009) (describing two ways to overcome the procedural bar); *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). The cause-and-prejudice test set forth by our supreme court in *Pitsonbarger* was subsequently codified into statute by our General Assembly, when it added section 122-1(f) of the Code of Criminal Procedure of 1963. See Pub. Act 93-493 (eff. Jan. 1, 2004). Section 122-1(f) provides, in full:

> "Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2012).

Both elements of the cause-and-prejudice test must be satisfied in order for the defendant to prevail. *People v. Guerrero*, 2012 IL 112020, ¶ 15.

¶ 52   However, the *Pitsonbarger* cause-and-prejudice test, set forth above, is not the only way to overcome the procedural bar against filing a successive postconviction petition. In *Ortiz*, our

supreme court stated: "we hold that in a nondeath case, where a defendant sets forth a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing [the] cause and prejudice" described in section 122-1(f). *Ortiz*, 235 Ill. 2d at 330. See also *People v. Anderson*, 401 Ill. App. 3d 134, 140 (2010) (our supreme court in *Ortiz* "specifically rejected the State's claim that all successive postconviction petitions are subject to that [cause-and-prejudice] test"). The *Ortiz* court held that "the due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a freestanding claim of actual innocence on newly discovered evidence." *Ortiz*, 235 Ill. 2d at 331.

¶ 53 In the case of a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *People v. Edwards*, 2012 IL 111711, ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence' [citation]." *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). The defendant must show that the evidence in support of his actual innocence claim is: (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result on retrial. *Ortiz*, 235 Ill. 2d at 333. Evidence is considered "newly discovered" if (1) it has been discovered since the trial; and (2) the defendant could not have discovered it sooner through due diligence. *Ortiz*, 235 Ill. 2d at 334. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Ortiz*, 235 Ill. 2d at 335. To determine whether the evidence "would probably change the result of retrial," the court must conduct a case-specific analysis of the facts and evidence. (Internal quotation marks omitted.) *Ortiz*, 235 Ill. 2d at 336-37.

¶ 54 Satisfying either the *Pitsonbarger* cause-and-prejudice test or the *Ortiz* actual innocence test will overcome the procedural bar against successive petitions. In the case at bar, defendant seeks leave to file his successive petition on both bases.

¶ 55                                    II. Actual Innocence Claim

¶ 56 Defendant first argues that the trial court erred in denying him leave to file a successive postconviction petition because he set forth a colorable claim of actual innocence. Defendant claims that newly discovered evidence provided by Green establishes that the victim was armed and threatening to kill defendant immediately before defendant shot him in self-defense and further establishes that one of the victim's friends removed the victim's gun from the scene before the police arrived.

¶ 57 As noted, in the case of a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence' [citation]." *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup*, 513 U.S. at 327). The defendant must show that the evidence in support of his actual innocence claim is: (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result on retrial. *Ortiz*, 235 Ill. 2d at 333. Evidence is considered

"newly discovered" if (1) it has been discovered since the trial; and (2) the defendant could not have discovered it sooner through due diligence. *Ortiz*, 235 Ill. 2d at 334. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Ortiz*, 235 Ill. 2d at 335. To determine whether the evidence "would probably change the result of retrial," the court must conduct a case-specific analysis of the facts and evidence. (Internal quotation marks omitted.) *Ortiz*, 235 Ill. 2d at 336-37.

¶ 58    Our supreme court has noted that the denial of a successive postconviction petition raising a claim of actual innocence is reviewed either *de novo* or for an abuse of discretion, but has declined to decide the question of the applicable standard of review. *Edwards*, 2012 IL 111711, ¶ 30. Like our supreme court, we have no need to resolve the issue, as defendant's claim in the case at bar fails under either standard of review. See *Edwards*, 2012 IL 111711, ¶ 30 ("We need not decide this question in this case, however. Petitioner's claim of actual innocence here fails under either standard of review.").

¶ 59    In the case at bar, the "newly discovered evidence" defendant points to as support for his actual innocence claim is in the form of Green's affidavit. In his affidavit, Green stated that on the day of the shooting, the victim approached defendant in the parking lot on his bicycle and was accompanied by the same friends who had pistol-whipped defendant two days prior to the shooting. Green further stated that the victim had a gun and told defendant that he would kill defendant. Green stated that Aaron Jackson, not defendant, yelled "GDK" and that one of the victim's friends removed the victim's gun from the scene. Green stated that the reason he did not come forward with this information earlier was that he was "scared" and that the police "said they [were going to] lock me up for accessory to murder if I didn't make the statement in which when I did make a statement they used what they wanted to use." Green further stated that "the reason I didn't clear it up at [defendant's] trial[ ] was because the State threatened to lock me up longer if I didn't cooperate with them[.] I didn't want to be locked up any longer[.] I was told what to say so I said it[.] I just wanted to get it over with and go home[,] not even thinking about what will happen to [defendant]."

¶ 60    Green's affidavit does not support a colorable claim of actual innocence. First, several of the statements in the affidavit were already introduced during defendant's trial, either through Green's testimony or through his statement to police, admitted as substantive evidence at trial. For instance, at one point during his trial testimony, Green testified that there were people near the victim when he was riding his bicycle toward defendant and that those people were the same ones who had been present when the victim had previously pistol-whipped defendant. Similarly, while Green was inconsistent in his testimony on the issue, he testified at one point that the yell of "GDK" could have come from defendant or Mooney, whom he now identifies in his affidavit as Aaron Jackson. Thus, these assertions are not "new."

¶ 61    Additionally, the arguably "new" information in Green's affidavit contradicts his testimony at defendant's trial and his statement to police. For instance, in his statement to police, Green stated that the victim did not have a weapon and never moved toward defendant. Green's affidavit attempts to explain this contradiction by stating that the reason he did not come forward with this information earlier was that he was "scared" and that the police "said they [were going to] lock me up for accessory to murder if I didn't make the statement [and] when I did make a statement they used what they wanted to use." Green further stated that "the reason I didn't clear it up at [defendant's] trial[ ] was because the State threatened to lock me up longer if I didn't cooperate with them[.] I didn't want to be locked up any longer[.] I was

told what to say so I said it[.] I just wanted to get it over with and go home[,] not even thinking about what will happen to [defendant]." However, these claims are affirmatively rebutted by the record.

¶ 62 As the State notes, Green's testimony at trial does not demonstrate that Green "cooperate[d] with" the State because the State "threatened to lock [him] up longer" if he did not do so. Instead, the record reflects that Green was extremely reluctant to testify consistently with his statement and, in fact, attempted to distance himself from the statement wherever possible. When the State questioned Green about the statement, Green acknowledged making the statement, but could not recall the date because he "[u]sed a lot of drugs." When the State asked about Green's claim in the statement that the victim did not have a weapon and never moved toward defendant, Green testified that while the statement included that assertion, "to be realistic, I didn't know what the hell was going on." He acknowledged that he signed the page and was allowed to make corrections but "I can't barely even read cursive, so I don't know how I can correct something that [the detective] wrote." On cross-examination, when the defense questioned Green about his assertion in the statement that once defendant shot the victim once or twice, the victim "went down," and defendant stood over the victim, shooting him "maybe five or six or seven times altogether," Green testified that the statement could not be true because the gun could not have held that many bullets. Green further testified that the detective taking his statement did not write down "the majority of what the truth was or what I had to say," but admitted that most of the assertions in the statement were true; while still under cross-examination, Green later testified that the assertions in the statement were not true but then admitted during redirect examination that he had reviewed the statement shortly before trial and told the assistant State's Attorney the statement was true. During cross-examination, Green also testified that he was considered a suspect at the time he gave his statement to police and heard the detective's account of what had occurred prior to giving his statement. He testified that he signed the statement because he was in fear of being sent to jail and that he had been in the holding cell at the Calumet Park police department for three days without being given food or water before signing the statement. Green also testified that he was unable to read the majority of the statement. Thus, far from cooperating with the State due to its threats "to lock [him] up longer" if he did not do so, Green's trial testimony demonstrates that he was actively *not* cooperating with the State. In fact, due to Green's testimony, the State called two witnesses specifically to testify as to the circumstances under which Green's statement was obtained and the prosecutor's conversation with Green prior to his trial testimony. Thus, we cannot find that Green's affidavit supports a colorable claim of actual innocence and, therefore, the trial court did not err in denying defendant leave to file his successive postconviction petition.

¶ 63 We find defendant's attempts to draw an analogy between his case and those of *People v. Molstad*, 101 Ill. 2d 128 (1984), and *People v. Sparks*, 393 Ill. App. 3d 878 (2009), to be unpersuasive. First, neither of the cases involved a successive postconviction petition, so the question before the reviewing court was slightly different than that present in the case at bar. In *Molstad*, the court was reviewing a posttrial motion for a new trial (*Molstad*, 101 Ill. 2d at 132), while in *Sparks*, the court was reviewing a first-stage dismissal of an initial postconviction petition (*Sparks*, 393 Ill. App. 3d at 879). See *Edwards*, 2012 IL 111711, ¶ 29 (holding that the standards for a first-stage postconviction petition and a successive postconviction petition are different, in part because "treating successive petitions the same as

- 13 -

initial petitions *** ignores the well-settled rule that successive postconviction actions are disfavored by Illinois courts"). Most importantly, in both cases, the "newly discovered evidence" submitted by the defendant was in the form of affidavits of witnesses who were unknown or unavailable to testify at the defendant's trial. *Molstad*, 101 Ill. 2d at 134-35 (testimony of codefendants was newly discovered evidence that could not have been earlier discovered, as codefendants could not be forced to incriminate themselves); *Sparks*, 393 Ill. App. 3d at 885 (testimony of eyewitness unknown to the defendant and who had been threatened by the actual shooter was arguably newly discovered evidence). Here, by contrast, Green was available and, in fact, testified at defendant's trial. Thus, *Molstad* and *Sparks* do not support defendant's argument and we affirm the denial of leave to file the actual innocence portion of defendant's successive petition.

¶ 64                                    III. Ineffective Assistance of Counsel

¶ 65        Defendant also argues that the trial court erred in denying him leave to file a successive petition raising several claims of ineffective assistance of counsel because he satisfied the *Pitsonbarger* cause-and-prejudice test. As noted, the cause-and-prejudice test set forth by our supreme court in *Pitsonbarger* was subsequently codified into statute by our General Assembly, when it added section 122-1(f) of the Code of Criminal Procedure of 1963. See Pub. Act 93-493 (eff. Jan. 1, 2004). Under section 122-1(f), leave to file a successive petition "may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2012). Section 122-1(f) further provides that: "(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2012). Both elements of the cause-and-prejudice test must be satisfied in order for the defendant to prevail. *Guerrero*, 2012 IL 112020, ¶ 15. Our review of the trial court's dismissal of defendant's postconviction petition is *de novo*. *People v. Edwards*, 197 Ill. 2d 239, 247 (2001). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 66        As an initial matter, defendant argues that we should not consider his postconviction petition to be a successive petition, but instead should consider it to be an initial postconviction petition. After defendant filed his initial postconviction petition, he sought to convert it into a motion for a new trial. Thus, since he did not wish for the first postconviction petition to in fact be considered a postconviction petition, he argues that the instant petition should be considered his initial petition. We have no need to answer this question, however, as even under the more lenient standards of a first-stage initial postconviction petition, defendant's ineffective assistance of counsel claims would fail.

¶ 67        The Illinois Supreme Court has found that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors,

there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 68    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

¶ 69    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 70    In the case at bar, defendant argues that his trial counsel was ineffective in the following ways: (1) failing to present any mitigating evidence at sentencing; (2) misleading defendant into waiving his right to a jury trial by promising him that he would be acquitted if he chose a bench trial; (3) coming to court intoxicated on at least one occasion prior to trial; and (4) failing to present available evidence of self-defense. We cannot find that any of these claims even arguably demonstrate ineffective assistance of counsel.

¶ 71    First, with regard to defendant's argument concerning counsel's failure to present mitigating evidence at sentencing, "failure to offer evidence in mitigation does not, in and of itself, demonstrate deficient performance." *People v. Orange*, 168 Ill. 2d 138, 167-68 (1995). Furthermore, "[e]ven where counsel's performance is deficient due to the failure to investigate mitigating evidence and present it to the [fact finder], the defendant must still demonstrate prejudice to sustain a claim." *People v. Pulliam*, 206 Ill. 2d 218, 239 (2002). In the case at bar, defendant argues that trial counsel was ineffective for failing to present mitigating evidence at sentencing, pointing to nine affidavits from defendant's family members who would have been willing to testify on defendant's behalf. These affidavits all state, in essence, that defendant was well-behaved and helpful growing up and demonstrated a strong work ethic through his employment history. However, defendant's presentence investigation report contained similar information about defendant's personal history, including his good relationship with his family and his employment history. Thus, as the presentence investigation report was considered by the trial court in sentencing defendant, the additional testimony of defendant's family members would have been essentially cumulative and defendant can show no prejudice on this basis. See *People v. Phyfiher*, 361 Ill. App. 3d 881, 886 (2005) ("Trial counsel cannot be faulted for failing to introduce mitigation evidence that was already presented in the report. [Citation.] Defendant cannot make out a claim of ineffectiveness where the testimony he claims should have been offered was cumulative to evidence already in the record."); *People v. Griffin*, 178 Ill. 2d 65, 88 (1997) (finding no prejudice where testimony from the defendant's family members as to the defendant's troubled childhood would have been cumulative, as the

information was already presented through the presentence investigation report). This distinguishes defendant's case from those he cites, which are death-penalty cases in which the record affirmatively demonstrated a lack of investigation and the court found the proffered mitigating evidence had the potential of influencing the sentence. See *Orange*, 168 Ill. 2d at 170-73; *People v. Steidl*, 177 Ill. 2d 239, 257-60 (1997).

¶ 72   Additionally, "we must assess prejudice in a realistic manner based on the totality of the evidence. Accordingly, it is improper to focus solely on the potential mitigating evidence." *People v. Coleman*, 168 Ill. 2d 509, 538 (1995); *People v. Easley*, 192 Ill. 2d 307, 341 (2000). Instead, "the nature and extent of the evidence in aggravation must also be considered." *Coleman*, 168 Ill. 2d at 538; *Easley*, 192 Ill. 2d at 341. In the case at bar, the trial court placed the most weight on the fact that the victim was shot to death during the middle of the day in front of a grocery store and that numerous gunshots were fired. The court also noted that, although he had no prior felony background, defendant was "not a newcomer" to the criminal justice system. For these reasons, the trial court sentenced defendant to 50 years, 5 years above the statutory minimum. Given this evidence in aggravation, "[t]he failure of defendant's trial counsel to place more information from defendant's past onto the scale probably would not have tipped it in defendant's favor." *Easley*, 192 Ill. 2d at 341. Accordingly, we cannot find even an arguable basis for ineffectiveness here.

¶ 73   Next, with regard to defendant's claim that he waived his right to a jury trial because trial counsel promised him an acquittal, defendant's affidavit in support of his postconviction petition states: "I told counsel that I wanted to go with a jury trial. He brought up that he knows the judge and that he will be *** basing it off 'law' which will be essential for me to get acquitted. He promised me freedom with a bench trial. Told me if I went with a jury, they could bring up that I was in a gang. Even though I was in a gang at the time, that was not a factor as to the shooting. He promised me that I will go home with a bench trial. So I went along with *his* decision." (Emphasis in original.) "When a defendant's challenge to a jury waiver is predicated on a claim of ineffective assistance of counsel, the court must determine: (1) whether counsel's performance fell below an objective standard of reasonableness; and (2) 'whether there exists a reasonable likelihood that the defendant would not have waived his jury right in the absence of the alleged error.' " *People v. Batrez*, 334 Ill. App. 3d 772, 782 (2002) (quoting *People v. Maxwell*, 148 Ill. 2d 116, 142-43 (1992)).

¶ 74   The decision of whether to choose a bench trial or jury trial belongs to the defendant, not to his counsel. *People v. McCarter*, 385 Ill. App. 3d 919, 943 (2008). However, "advice on waiving a jury trial constitutes the type of trial strategy and tactics that cannot support a claim of ineffectiveness." *People v. Elliott*, 299 Ill. App. 3d 766, 774 (1998). In the case at bar, defendant's counsel on appeal focuses on the portion of defendant's affidavit in which defendant states that trial counsel "promised me freedom with a bench trial" and "promised me that I will go home with a bench trial. So I went along with *his* decision." (Emphasis in original.) However, the sentence before the quoted language provides important context to the rest of defendant's statements: "He brought up that he knows the judge and that he will be *** basing it off 'law' which will be essential for me to get acquitted." It is clear from the entirety of defendant's affidavit that trial counsel was advising defendant to waive a jury trial because counsel knew that the judge would base his decision on the law instead of on the fact that defendant was a gang member, as a jury might do. This type of advice does not constitute ineffective assistance of counsel.

¶ 75        Defendant attempts to draw an analogy between his case and that of *People v. Smith*, 326 Ill. App. 3d 831, 848 (2001), in which the defendant alleged that his trial counsel advised the defendant "that it would be better to take a bench trial because the judge owed [the attorney] a favor and would have information not available to the jury" and the appellate court found the allegations sufficient to survive the first stage of the postconviction process. We do not find the situation here analogous to that one. Here, there is no allegation that trial counsel had any sort of illicit agreement with the judge that led to the waiver of a jury trial. Instead, trial counsel merely advised defendant that he would be more likely to obtain "freedom" with a bench trial because the judge would be "basing it off 'law.' " We find the situation here more analogous to that present in *People v. Hobson*, 386 Ill. App. 3d 221, 242 (2008), in which the defendant alleged: " 'When I told him [defense counsel] that I shot the deceased in self defense, he told me to waive a jury and take a bench trial. He told me that the judge *** would find me not guilty if I took a bench trial, that he knew the judge and the judge was alright.' " On appeal, authoring justice Joseph Gordon noted that "we cannot dismiss as unreasonable counsel's strategic decision to advise his client to opt for a bench trial with a trial judge whom defense counsel knew as sympathetic, rather than a trial with an unpredictable jury, whom defense counsel knew nothing about." *Hobson*, 386 Ill. App. 3d at 243. Further, the court found that "defense counsel's advice to defendant to waive his right to a jury because 'he knew the judge and [the judge] was alright' and would find him not guilty, constituted a prediction based upon counsel's evaluation of the mitigating circumstances of the case which counsel intended to assert on behalf of defendant and his knowledge by reputation and/or by experience of the trial judge's previous record." *Hobson*, 386 Ill. App. 3d at 243. In the case at bar, the advice trial counsel allegedly gave defendant is similar, and accordingly, we cannot find that it forms the basis for an ineffective assistance of counsel claim.

¶ 76        Next, defendant claims that trial counsel "came to court intoxicated and smelling of liquor on at least one occasion before trial." Even if these assertions are accepted as true, the fact that defense counsel was under the influence of drugs or alcohol does not establish *per se* ineffective assistance of counsel. See *People v. Burris*, 315 Ill. App. 3d 615, 617 (2000) ("That counsel was using alcohol or drugs at the time of defendant's trial does not establish *per se* ineffective assistance."); *People v. Barraza*, 253 Ill. App. 3d 850, 856 (1993) (specifically "reject[ing] the argument that we should find that defense counsel was ineffective *per se* because of an allegation that defense counsel was alcohol impaired"); *People v. White*, 180 Ill. App. 3d 781, 791 (1989); *People v. Bernardo*, 171 Ill. App. 3d 652, 659 (1988). In the case at bar, defendant does not allege that trial counsel's intoxication on an unspecified pretrial date prejudiced him in any way. In the absence of any prejudice, defendant cannot make even an arguable claim for ineffective assistance of counsel. See *White*, 180 Ill. App. 3d at 791. Defendant argues in his brief that "prejudice may be presumed where counsel's representation constructively amounted to a denial of counsel." However, defendant has not pointed to any way in which trial counsel's representation "constructively amounted to a denial of counsel" other than a bare allegation that trial counsel was intoxicated on an unspecified pretrial court date. We will not presume prejudice under the facts as alleged and accordingly find no basis for a claim of ineffective assistance of counsel.

¶ 77        Finally, defendant claims that trial counsel failed to present relevant evidence of self-defense. Specifically, defendant argues that trial counsel was ineffective for failing to introduce medical records that showed defendant had been shot in 2004, which would have

corroborated defendant's claim that the victim had previously shot defendant and supported his self-defense claim.[3] On direct appeal, we discussed a similar issue concerning evidence that defendant had been shot by the victim, namely, Green's attempt to testify that he had heard that the victim had previously shot defendant. *Simon*, 2011 IL App (1st) 091197, ¶¶ 69-72, 75-78. Although we found that there was no error in the exclusion of Green's testimony, we also found that even if there had been error, the evidence was not so closely balanced that it threatened to tip the scales of justice against defendant. *Simon*, 2011 IL App (1st) 091197, ¶ 75. Specifically, we noted:

> "Defendant was permitted to testify that the victim had robbed him, which was the same incident in which he was supposedly shot. Additionally, Green and defendant both testified to the pistol-whipping incident, so the trial court was aware that there was a history of the victim acting violently toward defendant. The trial court also heard from Green and defendant that the victim had threatened defendant with a gun several minutes prior to the shooting. Finally, the evidence was weighed heavily against defendant, with four eyewitnesses to the circumstances of the shooting. Any additional testimony concerning the victim's violent behavior toward defendant would not have tipped the scales in defendant's favor." *Simon*, 2011 IL App (1st) 091197, ¶ 76.

We also noted that, "[h]ere, *** defendant testified to the robbery, the pistol whipping, and the threat shortly before the shooting. His testimony regarding the pistol whipping and the threat were corroborated by Green's testimony, and Clayborn and Simms testified to defendant's demeanor directly after receiving the threat. Several witnesses also testified to the victim's membership in the Gangster Disciples gang. Thus, *** there was evidence of several instances of violent behavior by the victim and multiple witnesses testifying." *Simon*, 2011 IL App (1st) 091197, ¶ 77.

¶ 78 While in the case at bar defendant's burden is lower than on direct appeal, where he was arguing plain error, we find our previous analysis equally applicable to determining whether there is even an arguable basis for an ineffective assistance claim. In his brief, defendant claims that if defense counsel had used defendant's medical records to question defendant about the incident in which the victim shot defendant, "evidence of [the victim's] history of violence and aggression could easily have changed the court's assessment as to how threatening he actually was." However, in light of the evidence of self-defense that was presented at trial, in addition to defendant's ability to testify that he had been previously robbed by the victim, we see no way that the inclusion of this additional evidence would have had any impact on the outcome of the trial and, accordingly, defendant cannot raise even an arguable ineffectiveness claim.

¶ 79 In the case at bar, therefore, even looking at the postconviction petition in the way defendant urges–as an initial postconviction petition instead of as a successive one–defendant's arguments do not present even an arguable basis for ineffective assistance of counsel. Accordingly, the trial court did not err in denying defendant leave to file his postconviction petition.

---

[3]Defendant also states that "Alex Cruz and his brother Chico" were present during the prior shooting, but was unable to obtain affidavits from either of them.

¶ 80                                    CONCLUSION

¶ 81        The trial court did not err in denying defendant leave to file a successive postconviction petition because (1) the petition did not present a colorable claim of actual innocence and (2) even examining the petition under the more lenient standard of an initial postconviction petition, there is no basis for defendant's ineffective assistance of counsel claims.

¶ 82        Affirmed.