2022 IL App (1st) 201271-U

No. 1-20-1271

Second Division
September 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Respondent-Appellee, | ) | |
| | ) | No. 07 CR 14502 |
| v. | ) | |
| | ) | |
| DARNELL RICHMOND, | ) | Honorable |
| | ) | Timothy Joseph Joyce |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's denial of defendant's motion for leave to file a successive postconviction petition is reversed and remanded where he presented a colorable claim of actual innocence based on a newly discovered affidavit.

¶ 2     Defendant-appellant Darnell Richmond was found guilty of three counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2008)) and one count of robbery (720 ILCS 5/18-1(a) (West 2008)) and sentenced to three consecutive prison terms of 18 years for the counts

of sexual assault and a consecutive prison term of three years for robbery. This court affirmed his convictions on direct appeal. *People v. Richmond*, 2012 IL App (1st) 100125-U (unpublished order under Illinois Supreme Court Rule 23). He now appeals from the trial court's judgment denying his motion for leave to file his successive petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant argues that the trial court erred in denying his motion where his successive petition stated a colorable claim of actual innocence based on the newly discovered affidavits of Marcia Hatton and Lasean Jackson. For the reasons that follow, we reverse the trial court's denial of defendant's motion and remand for further proceedings under the Act.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged with three counts of aggravated criminal sexual assault with a weapon (case no. 07 CR 14502), one count of robbery (case no. 07 CR 12014), one count of attempted robbery (case no. 07 CR 12024), and one count of aggravated robbery (case no. 07 CR 14503), in four separate cases related to incidents all occurring on April 9, 2007. These four separate indictments were later joined; however, after private counsel was replaced with appointed counsel for defendant, the court granted defendant's motion to sever the aggravated robbery case (case no. 07 CR 14503). The remaining cases proceeded to a joint jury trial.

¶ 5     Prior to trial, the trial court granted, over defendant's objection, the State's motion *in limine* to bar questioning related to the sexual history of C.L., the aggravated criminal sexual assault victim, pursuant to the Rape Shield Statute (725 ILCS 5/115-7(a) (West 2006)).

¶ 6     At his trial, the State presented the following evidence.

¶ 7     C.L., a University of Chicago student, testified that on April 9, 2007, between approximately 8:30 and 8:45 p.m., she left her friend's apartment near the 53rd Street and Kimbark

Avenue shopping center. Before walking home, she stopped at Kimbark Liquors and Harold's Chicken at the where she purchased beer and a chicken dinner. She testified that her apartment near 55th Street and Everett Avenue was about a 20 to 25 minute walk. As she neared her apartment building, someone approached her from behind and applied pressure to her back. The individual, who she identified as a man, said to her, "I have a gun. Don't move. Give me your money." She retrieved her wallet from her backpack and gave it to the man. During this interaction, the man did not let her turn around and she was unable to see his face. At that time, a blonde woman with a ponytail was walking towards them and the man told C.L. to pretend nothing was wrong and warned her that he would shoot her otherwise. The woman passed them and entered the apartment building near where they were standing, and the man led C.L. into the parking lot next to the building. They were in between a van and a dumpster, and the man instructed C.L. to pull down her pants. He unzipped his pants, stood behind her, and made contact with her anus and entered her vagina with his penis. When she tried to turn around to see his face, the man forced her to face away from him. C.L. was menstruating at the time and was wearing a tampon. Because she believed that the man was becoming agitated by the tampon, she removed it. The man then forced C.L. to turn around, keep her head down, and perform oral sex on him by placing her mouth on his penis. Because of a noise on the street, the man decided to leave after taking between 50 and 100 dollars and some of C.L.'s beer.

¶ 8     After C.L. was certain that the man was gone, she asked a passerby for help and she was taken to the University of Chicago Medical Center. Gail Gray, a registered nurse at the University Chicago Medical Center, testified that she was working in the emergency room on the night of April 9, 2007. Gray confirmed that at approximately 9:45 p.m., she was assigned to meet with and treat C.L. Gray administered a sexual assault evidence collection kit (also known as a rape kit) on

C.L., which included swabs of her mouth, vagina, and anus. C.L. later met with law enforcement officers and described her attacker as a tall black male, wearing a puffy black coat with a fur-lined hood.

¶ 9    On April 10, 2007, C.L. viewed a physical lineup at the police station but did not identify anyone. She viewed a photo array the following day and was not able to make an identification. On June 21, 2007, detectives came to her home in New Jersey and showed her another photo array. She again was unable to make an identification.

¶ 10    Lauren Schubert, a forensic scientist with the Illinois State Police, testified that a person's DNA profile is comprised of several fragments with markers at 13 different locations (or loci), and these fragments vary from person to person and make each person's DNA profile unique. She examined C.L.'s rape kit and found a mixture of two DNA profiles present on the anal swab. The major profile matched C.L.'s DNA and the minor profile belonged to an unknown male. Specifically, the second profile produced an unambiguous reading at 9 of the 13 loci usually tested to create a complete DNA profile for purposes of identification. At the other 4 loci, Schubert found ambiguities. That profile with the 9 loci was entered into the DNA database, and in May 2007, the DNA database associated that profile with defendant, who had the same identified alleles at all 9 loci. The ambiguous data from the other 4 loci did not rule defendant out.

¶ 11    In September 2007, Schubert received a buccal standard from defendant and from that standard she was able to determine a DNA profile for defendant. In comparing defendant's DNA profile to the minor male profile from the anal swab, she concluded that defendant could not be excluded from having contributed to that profile. Because of the ambiguous loci on the anal swab profile, she could not state that defendant's DNA profile was a match. Statistically, she testified that 1 in 3.9 trillion black males, 1 in 750 trillion white males, or 1 in 1.8 quadrillion Hispanic

males cannot be excluded from having contributed to this profile. Based on those statistics, she testified that there was a strong association between defendant and minor male DNA profile and that it was unlikely that another individual could have contributed to the profile.

¶ 12     Lia Skalkos testified that earlier on April 9, 2007, at approximately 8:40 p.m., a man attempted to rob her as she was waiting for a school bus near the intersection of 56th Street and Lake Park Avenue, about four blocks from 55th and Everett. The man grabbed her arm, reached inside of his jacket, and stated, "This is a stickup." She screamed, ran away, and called the police. She described the man as a black male in his 20s, between 5'11" and 6' in height, and weighing approximately 165 pounds. She further stated that he was wearing a black puffy jacket with a fur-lined hood. She stated that the lighting at the time of the incident was pretty dim with only a streetlight nearby. Skalkos viewed photo arrays on April 10, 2007 and May 22, 2007 but was unable to identify her attacker.

¶ 13     Erin Luboff testified that, on the same night, around 10 p.m., she was walking to her apartment building near 54th Street and Kimbark, about one mile from 55th and Everett. She unlocked the first door and let herself into the lighted vestibule area. As she was searching for her key to the inside door, she was grabbed by the hips from behind. She turned towards the person behind her, who was male, and he pushed her into the wall. She slid to the floor, and the man punched her in the face and reached into her bag before running from the building with her cell phone. The landlord's son heard Luboff screaming and crying and came out of his apartment to assist her. She called the police, and she was taken to the hospital, where an x-ray showed that her nose was broken. Luboff testified that her attacker was a black male, about 108 pounds, in his 20s, and was wearing a dark coat with a fur-lined hood. Even though he had his hood up, she was able to see his face. The following day, Luboff viewed a photo array that did not include defendant.

She selected a photograph from that array but could not make an affirmative identification, stating that she was 80% certain that was her attacker.

¶ 14    On May 23, 2007, all three victims separately viewed a physical lineup that included defendant. Luboff positively identified defendant as the individual who robbed her. C.L. also viewed a physical lineup, but she could not identify anyone as the individual who sexually assaulted her. Skalkos made a tentative identification of defendant but was unsure whether he was her attacker. At trial, none of the victims, C.L., Luboff, and Skalkos, identified defendant in court as the individual who attacked them.

¶ 15    At the close of the State's case, defendant moved for a directed finding, which the trial court denied. The jury found defendant guilty of three counts of aggravated criminal sexual assault and one count of robbery. Defendant was found not guilty of attempted robbery. Defendant filed a motion for a new trial, which the trial court denied.

¶ 16    Following a sentencing hearing, the trial court sentenced defendant as a Class X offender to three consecutive 18-year prison terms for the counts of aggravated criminal sexual assault to run consecutive to a three-year term for robbery.

¶ 17    On direct appeal, defendant claimed that: (1) the trial court erred in allowing joinder of the three separate cases and, in the alternative, his private counsel was ineffective for not objecting to the joinder motion and his appointed counsel was ineffective for not moving to sever the cases; (2) he was not proven guilty of the robbery beyond a reasonable doubt; and (3) the trial court erred in applying the Rape Shield Statute in granting the State's motion *in limine*. In response, the State opposed defendant's claims, but also argued that his concurrent seven-year sentence for robbery was "void" and required a remand for consecutive resentencing.

¶ 18    This court affirmed defendant's convictions but remanded for consecutive sentencing on the robbery conviction. *Richmond*, 2012 IL App (1st) 100125-U (unpublished order under Illinois Supreme Court Rule 23). The Illinois Supreme Court denied defendant's petition for leave to appeal (*People v. Richmond*, No. 114873 (Nov. 28, 2012)), and the United States Supreme Court denied his petition for writ of certiorari (*Richmond v. Illinois*, 133 S. Ct. 1398 (May 20, 2013)). Upon remand, the trial court resentenced defendant to a consecutive three-year prison term for the robbery.

¶ 19    On September 12, 2014, defendant filed his initial *pro se* petition for postconviction relief. Therein, he alleged that trial counsel was ineffective for: (1) not presenting evidence that a finding based on a partial DNA profile was unreliable; (2) not asking for a limiting instruction regarding the State's use of the word "match" with respect to the DNA evidence; (3) not objecting to the State's repeated use of the word "match"; (4) failing to impeach one of the witnesses with a prior inconsistent statement; (5) failing to obtain separate DNA testing and expert testimony on behalf of defendant; (6) failing to request that the State be ordered to determine how many 9 loci "matches" exist in the DNA database; (7) failing to call an unnamed witness who C.L. testified walked by the right before the assault occurred; and (8) not objecting to the taking of defendant's DNA for a second time. He further alleged that the State failed to prove his guilty beyond a reasonable doubt based on the weak DNA evidence.

¶ 20    On November 21, 2014, the circuit court summarily dismissed his initial postconviction petition. This court affirmed the summary dismissal on appeal. *People v. Richmond*, 2017 IL App (1st) 150642 (unpublished order under Illinois Supreme Court Rule 23). Our supreme court denied defendant leave to appeal (*People v. Richmond*, No. 122553 (Sept. 27, 2017)), and the United

States Supreme Court denied his petition for writ of certiorari (*Richmond v. Illinois*, 138 S. Ct. 1292 (Mar. 19, 20180).

¶ 21    On October 22, 2019, defendant filed a motion for leave to file a successive postconviction petition, which is the subject of this appeal. In his motion for leave to file, defendant alleged that he had newly discovered evidence from two previously unknown eyewitnesses to C.L.'s assault, Hatton and Jackson. He asserted that both affidavits were newly discovered, material, noncumulative, and of such conclusive character that they would probably change the result on retrial. He contends that these affiants were unknown to him prior to their providing the affidavits and could not have been discovered sooner through due diligence. He further asserted that no eyewitnesses testified at trial identifying him as C.L.'s attacker. Hatton and Jackson's affidavits were attached to the petition.

¶ 22    Hatton averred that on April 9, 2007, around 9:30 to 10:15 p.m., she was sitting in her vehicle at the intersection of 54th and Everett when she noticed an Asian woman and a tall black male in dark puffy coat with fur on the hood "walking down 54th and Everett." She observed them stop walking and speaking to one another for about five minutes. At this point, Hatton exited her vehicle and began walking towards the building that the two individuals were standing in front of. The man turned to look at her and she observed that he had tattoos on his face. She then entered the apartment building. Hatton averred that the man she saw was not defendant, she "do[es] not know [defendant]," and no one forced, paid, or instructed her to make this statement. Finally, she stated that she was willing to testify to the information contained in the affidavit.

¶ 23    Jackson averred that if he was called as a witness, he would testify that on April 9, 2007, around 10 p.m., he was sitting in a vehicle near 54th and Everett waiting for his cousin, who had entered a nearby building, to return. He observed a tall, black male wearing a black puffy coat with

fur on the hood walking very closely behind an Asian female, who he averred looked frightened. The two were in front of the building that his cousin had entered when a white woman walked up behind them and entered the building. At this point, he saw the Asian woman and the man walk towards the parking lot next to the building. He observed that the man had his hand pressed tightly against the woman's back, and he then saw the man begin to "assault" the woman. Jackson ran into the building and informed his cousin that a woman was being "raped" outside but his cousin did not believe him. They did not exit the building for about 30 minutes. Later, his cousin told him to report what he had seen to the police but Jackson stated that he was too traumatized and afraid to do so. He further averred that he did not want to be a witness against somebody. He met defendant while incarcerated, and they discussed their convictions with each other. Jackson informed defendant that he was a witness to the crime for which defendant was found guilty and that the man he saw was not defendant. Finally, Jackson averred that he was coming forward with this information now because he knows what it is like to be convicted of a crime you did not commit and that he was providing this affidavit voluntarily.

¶ 24    On February 7, 2020, the trial court denied defendant's motion for leave to file. In particular, the court concluded that neither of the affidavits were so conclusive that it would likely change the result on retrial. The trial court also pointed out that the "blonde woman" who had walked by during the incident arguably could have been discovered earlier through due diligence because everyone involved in the case knew about her, just not her name.

¶ 25    This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    The sole issue before this court is whether the circuit court erred in denying defendant leave to file his successive postconviction petition. Defendant argues that he was entitled to file his

successive postconviction petition because he presented a colorable claim of actual innocence based on the affidavits of Hatton and Jackson.

¶ 28                                    A. Standard of Review

¶ 29    The Act provides a method for a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a) (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Generally, criminal defendants are entitled to file only one postconviction petition under the Act, which further specifies that any claims not raised in the original or amended petition are waived. 725 ILCS 5/122-3 (West 2016); *People v. Holman*, 191 Ill. 2d 204, 210 (2000). However, as relevant here, our supreme court has found that a criminal defendant may file a successive postconviction petition to prevent a fundamental miscarriage of justice. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). As such, the bar against successive postconviction petitions will be lowered in two instances. First, a defendant may raise a constitutional claim by satisfying the cause-and-prejudice test, which has been codified in the Act. 725 ILCS 5/122-1(f) (West 2018). Second, and as relevant here, a defendant may assert a claim of actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. In order to file such a successive postconviction petition, a defendant must first obtain "leave of court." 725 ILCS 5/122-1(f) (West 2016). We review *de novo* the denial of a motion for leave to file a successive postconviction petition. *Robinson*, 2020 IL 123849, ¶ 39.

¶ 30    The standard for filing a successive petition "falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing." *Id.* ¶ 58. A request for leave to file should only be denied "where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.* ¶ 44. A colorable claim means that "the petitioner's

supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* At this stage, all well-pleaded allegations that are not positively rebutted by the record must be taken as true and the court is precluded from making factual and credibility determinations. *Id.* ¶ 45.

¶ 31 To establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). New evidence is that which was discovered after and could not have been discovered earlier through the exercise of due diligence. *Id.* Material evidence is relevant and probative of the petitioner's innocence. *Id.* Noncumulative means the evidence adds to what the jury heard at the trial. *Id.* Finally, conclusive means evidence, that when considered along with the trial evidence, would probably lead to a different result on retrial. *Id.*

¶ 32 In this case, the State concedes that Hatton's affidavit is noncumulative and material and Jackson's affidavit is newly discovered, noncumulative, and material, and we agree. The only elements the parties dispute on appeal is whether Hatton's affidavit satisfies the newly discovered and conclusive elements and whether Jackson's affidavit satisfies the conclusive element. We address each affidavit and the pertinent elements in turn.

¶ 33                    B. Hatton's Affidavit

¶ 34 We first determine whether Hatton's affidavit was newly discovered.

¶ 35 Newly discovered evidence is that which could not have been discovered earlier through due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Our courts have found that newly discovered evidence includes testimony from a witness who "essentially made himself unavailable as a

witness" by moving out of state (*People v. Ortiz*, 235 Ill. 2d 319, 334 (2009)), testimony from a witness who had been made unavailable through threats or intimidations not to testify (*People v. White*, 2014 IL App (1st) 130007, ¶¶ 20-22), and testimony from a codefendant who cannot be forced to violate his own fifth amendment right to avoid self-incrimination (*People v. Edwards*, 2012 IL 111711, ¶ 38). Further, "[i]f an unknown, unobserved and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward to 'get involved.' " *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 63 (citing *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48)); see also *People v. Willingham*, 2021 IL App (1st) 162250, ¶ 26 (finding affidavit constituted new evidence where the defendant did not know the affiant existed or was present at the scene and the affiant did not come forward until after trial).

¶ 36    In the case before us, the record shows that C.L. saw a blonde woman, who we presume to be Hatton at this stage, enter the nearby apartment building moments before C.L. was sexually assaulted. As such, Hatton was observed at the scene; however, her name was unknown and, as far as the record suggests, unrecorded. According to the record, law enforcement never identified the blonde woman. There were also no allegations in Hatton's affidavit explaining why she did not come forward, such as fear or threats; however, that is not surprising where there is nothing in the record that would indicate that she had any knowledge that a sexual assault occurred involving the individuals she potentially saw outside the apartment building. There was also no information in either defendant's petition or in Hatton's affidavit explaining how Hatton was located.

¶ 37    Defendant argues that Hatton's affidavit is newly discovered because her identity was unknown at the time of trial and her affidavit was prepared after trial. He cites to *People v. Molstad*, 101 Ill. 2d 128 (1984), for support.

¶ 38    In response, the State contends that Hatton's affidavit does not constitute newly discovered evidence because the white woman with a blonde ponytail was referenced in C.L.'s trial testimony as being present at the time of the offense, and as such, defendant was clearly aware of this woman's existence and her potentially exculpatory information. The State also points out that defendant referenced this woman in his initial *pro se* postconviction petition where he alleged that his counsel was ineffective for failing to locate this "blond[e] girl" who might provide information that would exclude defendant as the perpetrator and also alleged that his appellate counsel was ineffective for failing to include this error on direct appeal. The State contends that this further demonstrates that the evidence was available at trial and could have been discovered sooner through due diligence. To support its assertions, the State cites to *People v. Jarrett*, 399 Ill. App. 3d 724 (2010).

¶ 39    We first discuss the applicability of *Molstad* to the circumstances before us, which the parties dispute. Defendant argues that we should follow the supreme court's holding in *Molstad* because, just as in that case, Hatton's affidavit here was prepared after trial. The State contends that *Molstad* is distinguishable, and we agree with the State for the reasons that follow.

¶ 40    Briefly, in *Molstad*, the defendant was found guilty of multiple offenses following a bench trial. 101 Ill. 2d at 130. Several codefendants were also convicted alongside the defendant. *Id.* The defendant filed a motion for a new trial based on new exculpatory testimony from his codefendants, which the trial court denied. *Id.* at 131. Our supreme court found that the defendant's motion for a new trial should have been granted because he had presented newly discovered evidence at the posttrial hearing on the motion. *Id.* at 136.

¶ 41    We first find that the procedural posture in *Molstad* was markedly different than that before us where the defendant's new evidence there was analyzed within the context of a motion for a

new trial, not a successive postconviction petition. 101 Ill. 2d at 132; see *People v. Simon*, 2014 IL App (1st) 130567, ¶ 63 (distinguishing *Molstad* on this basis). Although the same elements as an actual innocence claim are utilized in analyzing a motion for a new trial based on newly discovered evidence, there are different standards for assessing the new evidence when faced with a successive postconviction petition at the leave to file stage.

¶ 42    Additionally, we reject defendant's argument that Hatton's affidavit should be considered newly discovered because it was prepared after trial. This argument is predicated upon the supreme court's statement that "the affidavits were not prepared until after the guilty verdict and before the sentencing hearing." *Id.* at 134. However, this single sentence must be read within the context of the court's ultimate holding. The court held that the affidavits could not have been prepared earlier because no amount of due diligence could have forced the codefendants to violate their own fifth amendment right to avoid self-incrimination. *Id.* at 134-35. That is simply not the situation we are faced with here. Certainly, Hatton's affidavit was not prepared until after the guilty verdict but not because she was avoiding self-incrimination. Rather, no one knew her name and she was not located prior to trial. As such, *Molstad* is inapposite.

¶ 43    We next turn to *People v. Jarrett*, 399 Ill. App. 3d 715, 724 (2010), to which the State cites as an example of a case where this court found that an affidavit was not newly discovered despite the defendant not knowing the eyewitness's name at the time of trial. In particular, that court stated, "Evidence is not 'newly discovered' when it presents facts already known to a defendant at or prior to trial, even if the source of these facts may have been unknown, unavailable, or uncooperative." *Id.* However, not only are we not bound by the decisions of our sister divisions (*O'Casek v. Children*'s *Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008)), but this particular proposition set forth in *Jarrett* has been called into question by our supreme court's

decision in *Edwards*, 2012 IL 111711, ¶ 37, where the supreme court suggested that witnesses and their potential exculpatory information may be known prior to trial but they may nonetheless be considered unavailable depending on the circumstances.

¶ 44    In *Edwards*, the defendant, who was convicted of murder, filed successive postconviction petitions alleging actual innocence based on affidavits from a codefendant and two alibi witnesses. *Id.* ¶¶ 10, 12. After determining that the codefendant's affidavit was new because he could not be forced to violate his right to avoid self-incrimination, the court turned to the alibi witnesses, who refused to testify at the defendant's trial. *Id.* ¶ 38. Ultimately, the court found that the alibi witnesses' affidavits were not newly discovered because there was no attempt made to subpoena the witnesses prior to trial and thus due diligence had not been exercised. *Id.* However, in addressing the "unavailability" of those witnesses, the court stated: "We do not conclude that such evidence could never be considered unavailable where, as here, the witnesses rejected the petitioner's attempts to persuade them to testify." *Id.* ¶ 37. From this, we gather that, contrary to the holding in *Jarrett*, the supreme court recognizes that there are circumstances where a known witness who does not have any self-incrimination conflicts can be considered unavailable. The question is whether this is one of those situations.

¶ 45    In some ways, we are faced with a similar situation as the court in *Edwards*. The blonde woman was known to have been in the area just prior to the sexual assault and likely could provide relevant testimony. Defendant, claiming innocence, would then know that the blonde woman might have exculpatory information that could identify someone other than himself as the perpetrator. However, this known witness was unavailable because she had not been located. We do not know why she was not located prior to trial or how she was located now. Nonetheless, if we follow *Edward*'s reasoning, the failure to locate this witness prior to trial demonstrates

defendant's lack of due diligence and thus the evidence should not be considered newly discovered. See *Edwards*, 2012 IL 111711, ¶¶ 36-37 (finding a lack of due diligence where there was no indication that the defendant's attorney attempted to subpoena the alibi witnesses or any explanation as to why subpoenas were not issued).

¶ 46    In his reply brief, defendant asserts that the failure to discover "the identity of some random stranger previously unknown to them based on such a vague description like a white female with a blond[e] ponytail" cannot be considered a lack of due diligence. We disagree with this assertion. This "random stranger" was eventually found, although it is unclear how she was located 12 years later. Regardless, this suggests that her identity was discoverable. Additionally, all parties involved at the time of trial were aware of, presumably, where this woman might live as she appeared to enter an apartment building that night. There was arguably enough information to locate this woman prior to trial. Moreover, it remains defendant's burden to obtain leave, and he " 'must submit enough in the way of documentation' " to allow a circuit court to determine whether leave of court should be granted. *Edwards*, 2012 IL 111711, ¶ 24 (quoting *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010)). Here, defendant has not met that burden where the allegations in the petition and affidavit fail to demonstrate that due diligence was exercised or that no amount of due diligence could have discovered this witness earlier.

¶ 47    We recognize that defendant has previously argued in his initial postconviction petition that his trial counsel was ineffective for failing to locate this witness prior to trial, although we note that he does not make any such assertions in his petition or in his arguments before this court. The State claims that this argument demonstrates that the witness was known and the evidence could have been discovered earlier. Our research on this issue has uncovered one case from this court that supports a finding that defense counsel's lack of due diligence renders the evidence not

newly discovered. See *People v. Carroll*, 2022 IL App (1st) 182623-U, ¶ 26 (finding that if counsel's assistance was objectively unreasonable and did not exercise due diligence, then the affidavit could not be considered newly discovered; but if counsel exercised due diligence and could still not discover the witness's testimony, then the affidavit qualifies as newly discovered evidence). However, we are also aware of two cases that suggest a contrary conclusion. That is, that evidence can be considered newly discovered in spite of or by virtue of counsel's deficient performance. See *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 136 (holding that relaxation of the newly discovered requirement "may be necessary where a defendant's presentation of evidence is hindered by his attorney's performance"); *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 141 (concluding witness affidavits to be newly discovered where the defendant alleged in his petition that "counsel's deficient and conflicted performance rendered these witnesses unavailable" and "no amount of due diligence could have compelled their conflicted counsel to call witnesses" who would inculpate counsel's other client).

¶ 48    Although those cases are illuminating, we need not dissect them here because we find that *Edwards* controls our result. See *People v. Artis*, 232 Ill.2d 156, 164 (2009) (stating that supreme court decisions are binding on this court). As we have already discussed, our supreme court in *Edwards* determined that the defendant's affidavits from known alibi witnesses who refused to testify at trial could not be considered newly discovered because defendant did not subpoena these witnesses before trial. 2012 IL 111711, ¶ 36. The court held that "where there was no attempt to subpoena [the witnesses], and no explanation as to why subpoenas were not issued, the efforts expended were insufficient to satisfy the due diligence requirement." *Id.* ¶ 37. As such, those affidavits could not be used to support defendant's actual innocence claim. *Id.* ¶ 41. In so concluding, the *Edwards* court did not consider whether any potential deficient performance on

behalf of defense counsel should affect its determination. Rather, the court reasonably attributed the error of not subpoenaing the alibi witnesses to defendant and further assumed that the reason why the witnesses were not subpoenaed was because "the witnesses' testimony would not have been helpful." *Id.* ¶ 36.

¶ 49 Most significantly, here, defendant has not made any contention in the petition before us that he instructed counsel to locate this woman, that his counsel refused to do so, that his counsel's performance was deficient, or that no amount of due diligence could have located this woman because his counsel refused to investigate her. He merely states that Hatton "came forward with her affidavit in 2019[.]" The *Edwards* court was also not confronted with such contentions, and the *Edwards* court did not read into the defendant's petition arguments that were not made before the court. Nor shall we.

¶ 50 As such, in accordance with *Edwards*, we find that the failure to locate this witness earlier is likewise attributed to defendant, and we must conclude that defendant failed to exercise due diligence and Hatton's affidavit, therefore, cannot be considered newly discovered evidence.

¶ 51                                C. Jackson's Affidavit

¶ 52 We now turn to Jackson's affidavit, and specifically whether it satisfies the conclusive character element for an actual innocence claim at this leave to file stage.

¶ 53 We first address defendant's contention that, in assessing the affidavits' conclusive character, the trial court prematurely and improperly engaged in a credibility assessment of the affidavits. Of course, as the State accurately points out, under *de novo* review, we need not assess the trial court's reasoning for its conclusions and such reasoning has no bearing on our review here. See *Robinson*, 2020 IL 123849, ¶ 39 ("[A] reviewing court is as capable as the circuit court of determining whether a petition and supporting documents contain adequate allegations."); see

also *People v. Horton*, 2021 IL App (1st) 180551, ¶ 42. Nonetheless, we note that the trial court issued its ruling on defendant's postconviction petition in June 2020, a month prior to our supreme court issuing its decision in *People v. Robinson*, 2020 IL 123849, a significant case in actual innocence jurisprudence providing clarity on the nature of our review at the leave to file stage, particularly in regards to the conclusive character element. As such, the trial court did not have the benefit of *Robinson*'s guidance, as we do here.

¶ 54    *Robinson* provides the following principles in determining whether an affidavit is sufficiently conclusive, which is the most important element of an actual innocence claim. 2020 IL 123849, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). As to conclusiveness, we must determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). Further, an actual innocence claim does not require a defendant to show total vindication or exoneration or that the new evidence be "entirely dispositive," as "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* Again, at this stage the court is precluded from making factual and credibility determinations and must take all allegations not positively rebutted by the record as true. *Id.* ¶ 81. In order for new evidence to be "positively rebutted," the trial record must demonstrate that "no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible[.]" *Id.* ¶ 60.

¶ 55    Here, Jackson's affidavit provides the following evidence to support defendant's claim of actual innocence. On April 9, 2007, around 10 p.m., Jackson was sitting in a vehicle near 55th and Everett and observed a black male, who he affirmatively stated was not defendant, walking closely

behind an Asian woman, presumed to be C.L. He saw the man grab the woman and moments later a blonde woman passed by them and entered a nearby apartment building. He then saw the man lead the woman towards the parking lot next to the building and sexually assault her. Jackson averred that he never came forward with the information because he was afraid of potential retaliation as a witness. Jackson learned from defendant while they were incarcerated that defendant had been, according to the affidavit, wrongly convicted for this sexual assault Jackson observed on April 9, 2007.

¶ 56    Defendant contends that this affidavit is sufficiently conclusive where it places the State's evidence in a new light and raises questions as to the identification of defendant as the perpetrator, which defendant asserts is all that is required at this stage of the proceedings. The State, however, argues that Jackson's affidavit is not conclusive because: (1) Luboff, the robbery victim, identified defendant at a physical lineup, and her description of her attacker matched that of C.L.; (2) there was "powerful DNA evidence" linking defendant to the sexual assault of C.L.; and (3) the timing of Jackson's observations does not align with the sexual assault of C.L.

¶ 57    We agree with defendant's assertion that "nothing in the record makes the claims in Jackson's affidavit incontestably false or impossible[.]" In his affidavit, Jackson averred that he observed a black man in a puffy coat with a fur-lined hood, who he clearly stated was not defendant, sexually assault an Asian woman in a parking lot near 54th Street and Everett on April 9, 2007, around 10 p.m. Just prior to the attack, he observed a blonde woman enter the nearby building. This narrative largely aligns with that of C.L. and provides some indicia of trustworthiness, notwithstanding the proscription against making credibility determinations at this stage.

¶ 58    In regards to the victims' identification of defendant, the record shows that, on the day following the robbery, Luboff viewed a photo array and made a tentative identification of an individual other than defendant as the perpetrator, and more than a month later, Luboff viewed a physical lineup and positively identified defendant as the man who robbed her. C.L. never affirmatively identified defendant as her attacker, and there was no video or photographic evidence proving such either. Neither C.L. nor Luboff were able to identify defendant as their attacker at the trial. They did provide similar descriptions of their attacker, as a tall, black male wearing a dark or black puffy coat with fur on the hood; however, C.L. repeatedly stated that her attacker prevented her from seeing his face and Luboff noted that it was dark out and there was not much lighting in the area where the robbery took place.[1] Based on this record, we find that the victims' identifications of defendant were not conclusive and merely conflict with the information contained in Jackson's affidavit. See *Robinson*, 2020 IL 123849, ¶ 60 (stating that "recognizing the existence of conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted"). As such, this evidence does not defeat defendant's actual innocence claim.

¶ 59    The only other evidence, and admittedly, the most significant evidence, pointing to defendant as the individual who sexually assaulted C.L. was the partial DNA match from C.L.'s anal swab. The forensic scientist testified that she could not conclusively state that the DNA profile from that swab matched defendant's DNA profile but stated that there was a strong association with a match at 9 of 13 loci. The statistics provided also suggest that it is extremely unlikely that another individual other than defendant could match the DNA profile. Nonetheless, although we

---

[1] We recognize that Skalkos also provided a similar description and tentatively identified defendant as her attacker at the physical lineup; however, defendant was ultimately found not guilty of the attempted robbery of Skalkos. Thus, we do not consider her identification in concert with that of C.L. and Luboff.

recognize that this partial match constitutes strong evidence identifying defendant as the perpetrator, it cannot be construed as incontestable, where there is a possibility of another individual matching the DNA profile. Thus, we do not believe that the DNA evidence renders defendant's actual innocence claim meritless.

¶ 60    Finally, we address the State's contention that the timing of events alleged in Jackson's affidavit is rebutted by the record. The State points out that Gray testified that, at approximately 9:45 p.m., she was assigned C.L. as her patient and Luboff testified that she was robbed close to 10 p.m., and as such, it could not be possible for Jackson to have observed the sexual assault at 10 p.m., where C.L. was already at the hospital and Luboff's attacker was around one mile away from the location of the sexual assault.

¶ 61    In assessing conclusiveness, we must consider the new evidence along with the evidence presented at trial. *People v. Taliani*, 2021 IL 125891, ¶ 59. We find that the State's representation of the record is accurate, and there is a discrepancy between the time alleged in Jackson's affidavit (around 10 p.m.) and the time which the sexual assault would have occurred according to Luboff and Gray's testimony (prior to 9:45 p.m.). However, this is testimony from trial witnesses, which is not conclusive proof of when the incident occurred, and witness testimony must be weighed by the factfinder. Notably, there are likely medical records that could corroborate Gray's testimony. Although a search of the record does not reveal these records, there are references to medical records being subpoenaed and later received. Nonetheless, based on the record before us, the timing of the sexual assault has not been incontrovertibly proved.

¶ 62    Additionally, "[t]he new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 48. Jackson's affidavit was prepared in 2019, twelve years after the incident he witnessed. It is reasonable that his recollection of the time may

not be exact. Further, the witnesses all testified as to the approximate time of the occurrences, rather than precise times. We find that it would be premature to reject the affidavit on this basis at this stage. This is an issue that is best ferreted out by a factfinder. Thus, the timing issue can be determined if defendant's petition advances to an evidentiary hearing, at which time the trial court can weigh Jackson's testimony and make fact and credibility determinations. See *Robinson*, 2020 IL 123849, ¶ 61 ("Credibility findings and determinations as to the reliability of the supporting evidence are to be made only at a third-stage evidentiary hearing in a successive postconviction proceeding.").

¶ 63 As we have explained, none of the information contained in Jackson's affidavit can be affirmatively and incontestably demonstrated to be false or impossible based on the evidence presented at the jury trial. Therefore, construing Jackson's affidavit liberally, as we must, we cannot say that no factfinder could accept his affidavit as true.

¶ 64 Ultimately, Jackson's affidavit provides an eyewitness account that unambiguously refutes the identification of defendant as C.L.'s attacker—an identification that was not conclusively proved at trial by forensic evidence or by the victims' testimony. Jackson's testimony presented for the defense, could alter the result on retrial where defendant offered no evidence in his defense at the original trial. "[T]he conclusive character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. Taken as true, we find that this eyewitness account constitutes newly discovered, material, noncumulative evidence of actual innocence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. See *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36 ("Where the

statement of a witness is both exonerating and contradicts a State witness, it can be capable of producing a different outcome on retrial.").

¶ 65 Accordingly, we conclude that defendant has submitted a colorable claim of actual innocence based on the affidavit of Jackson, and we reverse the trial court's denial of defendant's motion for leave to file his successive postconviction petition and remand for further proceedings under the Act.

¶ 66                              III. CONCLUSION

¶ 67 For the reasons stated, we reverse the judgment of the circuit court and remand for further proceedings under the Act.

¶ 68 Reversed and remanded.