2022 IL App (1st) 210685-U
No. 1-21-0685

FIRST DIVISION
November 14, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05 CR 27340 |
| | ) | |
| JONATHAN BROOKS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |
| | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm the circuit court's judgment granting the State's motion to dismiss and dismissing defendant's postconviction petition over defendant's contention that: (1) he received ineffective assistance of trial and appellate counsels related to the failure to instruct the jury regarding self-defense and second degree murder; and (2) his trial counsel was ineffective and, in particular, had a conflict of interest at time that he represented defendant at the sentencing hearing.

¶ 2    On appeal from the second-stage dismissal of his amended petition for postconviction relief, defendant, Jonathan Brooks, argues that the circuit court erred in granting the State's motion to dismiss where: (1) he was denied effective assistance of trial counsel for failing to propose jury

instructions for self-defense and second degree murder, and ineffective assistance of appellate counsel for failing to raise this issue on direct appeal; and (2) he was denied effective assistance of trial counsel for refusing to investigate and present testimony of witnesses in mitigation and this refusal constituted a conflict of interest. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Defendant was convicted by a jury of first degree murder for the shooting death of Demetrius Thomas (Demetrius) and aggravated battery with a firearm for the shooting of Samuel Gayden (Samuel), which occurred on November 8, 2005. The trial court sentenced defendant to 50 years' imprisonment for first degree murder and a consecutive 15-year sentence of imprisonment for aggravated battery with a firearm.

¶ 5        Defendant challenged his conviction on direct appeal on the grounds that his trial counsel was ineffective for allowing the State to introduce evidence of his prior convictions. On December 23, 2009, defendant's convictions were affirmed on appeal by this Court in an unpublished order. *People v. Jonathan Brooks*, 1-07-1693 (2009) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 6                                   Trial Testimony

¶ 7        The State presented the eyewitness testimony of Samuel Gayden. Samuel testified that on November 8, 2005, at approximately 1:00 a.m., he and Demetrius drove to the house of Ja'nat Smart (Ja'nat), Demetrius' cousin, around 57th and Wabash, Chicago, Illinois. They parked on the right side of the street facing north. Samuel was dressed in a black jacket with a black hoodie sweater and a knit cap, and Demetrius was dressed in a black sweater. Neither of them was wearing gloves or masks.

¶ 8      Samuel and Demetrius hung outside the front of the home with Justin Smart, Ja'nat Smart's brother. They talked and drank Seagram's Blue Label vodka. After going inside the house to ask Ja'nat for her telephone number, Samuel went back outside, and he heard someone across the street yelling, "What's up? Who is that over there?" Demetrius responded, "Who is that?" At this point, the person across the street said, "Check it out who is that?" Two men then walked across the street to where Samuel, Demetrius, and Justin were standing.

¶ 9      Samuel identified defendant and "Mojay" as the two men who approached them. Samuel had never met defendant before, but he knew Mojay for approximately two years. Samuel did not see any other people outside at that time. Samuel, Demetrius, and Justin shook hands with Mojay, but not defendant. Defendant asked them if they were selling drugs. Demetrius told defendant that no one was selling drugs because their family lived in that area, and defendant began "running his mouth" telling them that they alone could sell drugs in that area. While Mojay was laughing, defendant was "mad as hell[.]" Demetrius became angry, and both he and defendant began to argue. Mojay stood between them and stopped the argument. Defendant got mad again after someone said that he was drunk.

¶ 10      The group of men continued to hang out and drink from bottles of gin. Defendant told Mojay that he was going to "the crib" and would be back. Samuel saw defendant walk across the street. While defendant was gone, Justin walked into Ja'nat's house. Samuel and Demetrius walked towards Demetrius' car. Demetrius sat down in the driver's seat. Samuel was talking to Mojay, who was standing approximately ten feet away on a porch to his right side. Samuel began to enter the car. As soon as he sat down in the front passenger seat and closed the car door, he heard "a big boom." He was knocked onto Demetrius' lap. He was shot in the back of his right arm from someone who was behind him and to the right side. Demetrius pushed him off his lap, and Samuel

told him that he had been shot and to drive off. Samuel looked behind him and saw defendant was seven to eight feet behind the car and holding a gun.

¶ 11    Samuel heard more gunshots as Demetrius pulled out of the parking space before crashing into a parked van. Demetrius jumped out of the car followed by Samuel. Demetrius turned around and told defendant, "[L]ike man, we ain't on that." Defendant looked in Demetrius' direction and fired four or five more gunshots. Samuel ran north followed by Demetrius. While they were running, Demetrius fell and yelled for Samuel to help him. Samuel ran back and picked him up. As they were walking, a marked police squad car arrived. The officers told them to get down on the ground, and Samuel removed his bloody coat to show them that he had been shot. The bullet had entered the rear part of his right bicep and exited his chest.

¶ 12    Ja'nat Smart testified that she lived 5623 South Wabash and was standing outside the front of her house that night along with Demetrius, Samuel, and her brother, Justin. She saw defendant on a porch across the street looking in their direction and yelling "check it out" to someone inside that house. A taller male approached defendant and then the two of them walked across the street and towards her. She testified that Samuel and defendant argued, but she couldn't understand what was being said. She recalled that Demetrius tried to calm them down.

¶ 13    After everyone had calmed down, the group continued to talk. Defendant said that he had to do something or to get something. Another argument developed, at which point, Ja'nat and Justin went into her house. While inside the house, she heard three to four gunshots coming from the front of her house. She ran to the window and did not see Demetrius' car. Both Ja'nat and Justin ran to the front of her house, saw police cars in the street and that Demetrius' car had crashed into a van. She did not see Demetrius, Samuel, defendant, or the taller male who had been with defendant. She received a phone call from Samuel when he was in the ambulance and learned that

Demetrius had been taken to Cook County Hospital. She subsequently viewed a physical lineup at the police station and identified defendant.

¶ 14    Brian Gilbert testified that at approximately 1:30 a.m. on November 8, 2005, he and a friend, Emma Williams, was walking towards the back yard of his home at 5607 South Wabash when he saw three to four males standing in the middle of the 5600 block of South Wabash. He did not see these males fighting, tussling, yelling, or screaming. Three to four minutes after he got to his back yard, he heard five or six gunshots coming from the middle of the block. He and his friend both ducked down. Then, he heard car tires screeching, people running, and then three or four more gunshots. Brian saw two black males running through a vacant lot towards Michigan Street, one block just east of Wabash. When the second male fell to the ground, the first male turned around and urged him to get up. The male who had fallen, grabbed his side and said, "I can't. I am hit." The two males were able to make it to a vacant lot where the police and ambulance eventually found them. Brian did not see either of these two men in possession of a gun, throw a gun, or pick up a gun while they were running. These two men were not wearing masks. When the police were looking around the area, he never saw any of the police officer pick up a gun. He described this particular vacant lot as barren with just grass and a small dirt walkway.

¶ 15    Chicago Police Officer Brent Yoshikawa testified that he and his partner, Officer Edward Delao, were conducting a street stop at the corner of 57th and State Streets when he heard three gunshots. The officers returned to their marked squad car and drove in the direction of the gunshots towards the 5600 block of Wabash. When they arrived, Officer Yoshikawa saw that a car had crashed into parked cars on the east side of Wabash and defendant was standing on the sidewalk approximately ten feet away. The officer exited his squad car and called for defendant to come over. Defendant looked in his direction and fled on foot. While both officers chased defendant on

foot, defendant was gripping the right front pants pocket with his right hand. Defendant ran through an empty lot towards the west alley of Wabash. Upon reaching the alley, defendant slipped, and the officers were able to stop him and handcuff him. During a custodial search, the officers found a .38 caliber semi-automatic handgun containing one live round in the chamber. While defendant was being placed under arrest, he told the officers "Yeah, I got both of them."

¶ 16 Defendant was transported by other Chicago police officers for a show-up identification to the area where the victims were being treated. Samuel Gayden identified defendant as the person who shot him. Demetrius was unable to participate in the show-up identification process because he was receiving medical treatment from the paramedics.

¶ 17 Chicago Police Detective James Anderson testified that when he arrived, the crime scenes were secured, and he saw the black Lincoln crashed into a parked van along with two .380 caliber cartridge casings approximately ten feet behind the car. Inside the car, he saw a .380 caliber bullet on the front passenger seat. He did not see any guns, any other fired bullets or cartridge casings at this scene. He saw skid marks on the street consistent with a vehicle pulling away from the curb onto Wabash Avenue at a high rate of speed. On the south side of 56th Street, east of Wabash, there was a vacant lot that had a cellular telephone and a knit cap. On the north side of the street, he saw a mask, some gloves, and a jacket.

¶ 18 Forensic Investigator James Shader processed the different scenes. From a north vacant lot at 56th Street and Michigan Avenue, Investigator Shader recovered a bloody jacket with a hole in the right shoulder, a cap that was inside the jacket, a skier's mask, and leather gloves. From a south vacant lot at 56th Street and Michigan Avenue, he recovered a blue cap with a basketball player logo, along with a cellular telephone. In the crime scene where the shooting occurred, the investigator saw a black Lincoln Continental that had crashed into two parked cars at

approximately 5621 South Wabash. The Lincoln Continental had firearms damage to the back rear quarter panel, the passenger window was shattered, and there was a bullet that was "partially deformed from whatever it had struck" in the front passenger seat of the car. Investigator Shader found a cartridge casing in the street behind the car and a second fired cartridge casing lying on the grassy parkway closer to the curb and immediately behind the car. He did not find any guns or holsters during the search of the two crime scenes.

¶ 19    Once defendant was transported to the police station, Robert Berk, a forensic scientist and an expert in the field of gunshot residue, conducted a gunshot residue test on defendant, the bloody jacket and the leather gloves. Defendant's hands and the leather gloves tested positive for gunshot residue while the bloody jacket tested negative for gunshot residue. Later that morning, Ja'nat Smart identified defendant in a physical lineup.

¶ 20    Demetrius was taken to Cook County Hospital where he later died. Doctor Nancy Jones conducted an autopsy of Demetrius and determined that he died of a single gunshot wound to the right front shoulder that severed his axillary artery. She found and recovered a medium caliber copper jacketed bullet lodged into the right back area. There was no evidence of a close-range firing. She determined that the cause of death was gunshot wound to his right front shoulder, and the manner of death was homicide.

¶ 21    Kurt Zielinski, an expert in firearms identification, testified that the handgun recovered from defendant, which he described as a .380 caliber semi-automatic pistol, fired the bullet that killed Demetrius, fired the bullet recovered from the passenger seat of Demetrius' car, and fired the two fired cartridge casings that were recovered from the rear of Demetrius' black car. He further conducted a trigger pull examination and determined that this gun was a "properly functioning firearm."

¶ 22     In his defense, defendant presented the testimony of Marcus Sean Neal (Marcus), Ashana Brown (Ashana), Jeffery Hyde (Jeffery), and Mack White (Mack). Marcus testified that he lived on the block and was sleeping when he heard gunshots. It took him three to five minutes before he got to the front of his house and looked outside. He saw police squad cars outside. He also saw one officer, who he described as an African American police officer in uniform and between 5'11" and 6'2", reach into a car that had crashed and pull back out. Then he heard the officer whistle, say "we got one" and hold something up. He could not see what the officer was holding up.

¶ 23     Ashana Brown testified that she and defendant had a five-week-old baby at the time of the shooting. Later that evening, she and defendant were hanging out on the front porch of his home at 5644 South Wabash. Defendant went to talk to his friend, Mack White, who was standing in a vacant lot down the street, and Ashana went inside to check on the baby. When she came back outside, she heard someone from across the street call to defendant and Mack White. She was playing a game on her cellular phone, but saw defendant and Mack walk across the street. She then saw a black car driving at a high rate of speed stop in front of where defendant was standing with other men. She could not see their faces but noticed that they wore dark clothing. A few minutes after the men got out of that black car, she heard an argument, saw a scuffle, and then heard one or two gunshots. She did not see anyone getting shot and did not see anyone, including defendant, with a gun. At that point, Ashana ran into the house and heard another three or four gunshots. When she looked outside again, she saw a police car coming down the street and some police officers chasing the men, including defendant. She also saw a Caucasian police detective enter the back seat of the car that had crashed and pull out an object that looked like a gun. She testified that the detective held up the object and then dropped it into a bag being held by another detective.

¶ 24     Jeffery Hyde testified that he was friends with defendant from this neighborhood. He denied that his nickname was "Mojay." He further testified that on the night of the shooting, he was hanging out with a total of five or six males, including defendant, Marcus, and "Pun." He saw a black car drive down the street and two men exit the car. Jeffery and the other men asked the two men who they were and what they were doing. An argument began between these two groups of men. He saw defendant get into a "tussle" with one of the two men. He heard a gunshot and then everyone ran. He was "right there" but he did not see a gun or who fired the gun. When he heard the gunshot, defendant was there, along with the other men. The two men got back into the black car and then crashed into two parked cars. The two men exited the car and the driver started shooting. The other man was holding a gun. These two men ran down the street and the driver still had the gun with him. He saw the driver running down the street and shooting behind him.

¶ 25     Jeffery further testified when the police arrived, defendant ran away after the police officer asked him to come towards him. He saw Caucasian police officer, wearing a uniform, find a gun on the front passenger side of the car that had crashed. The officer whistled and held up the gun. He did not see what happened to the gun afterwards.

¶ 26     Mack White testified that he lived at 5613 South Wabash and stopped to talk to defendant while defendant was sitting on the side of a vacant lot. Mack left to go home and later heard a gunshot and a car crash. He went to his front window and saw two young men wearing "hoodies" running across his yard and shooting behind them. He later saw a short, African American police officer, wearing a police uniform, enter the passenger side of the crashed car, pick up an object and say "I got it" before going back to his marked squad car.

¶ 27     Defendant testified at trial that he was on the 5600 block of South Wabash that evening and first had a conversation with Ashana Brown and then Marcus Neal and Mack White. Defendant

then walked across the street and saw two cars going slowly down the street. He joined his friends "Shortie," "Cooley," "Pun," and "J.J." He hung out with his friends for approximately one hour when he saw a car pull up, park, and two men exited the car. At that point, defendant noticed that he was alone when "Pun" left and "J.J." was backing up. Both occupants of the car approached him, and one of the men asked him if he could purchase some "weed." Defendant told him that he did not have any, but he was "paying close attention" to these men. Referring to the passenger of the vehicle, defendant testified, "I see the n***er. I see the n***er like trying, you know he is trying playing body language. He is doing justice like moving around. I see the n***er reach. When he reached I immediately as he reached, I head for the pistol with the n***er."

¶ 28     Defendant further testified that the man reached into the waistline of his pants and pulled out a "chromy" pistol. The passenger had his back turned to defendant, but defendant grabbed the pistol with both hands and fought with the passenger. During the struggle, defendant bit the passenger in the wrist. As defendant was attempting to get the gun, he bit the passenger's wrist a little harder, and the gun fired one time. Defendant was able to grab the gun away from the passenger and then ran towards the side of the street, holding this gun. At that point, he saw the driver pull a gun from his waistband and "up the gun." Defendant hid and heard car doors closing followed by screeching tires. He heard four more gunshots coming in his direction which, he testified, must have been fired by the passenger.

¶ 29     Shortly thereafter, he saw a police car, without its emergency lights activated, and he ran away while holding the gun in his hand. He shoved the gun in his pocket when he was running away. Defendant testified that he never fired the gun while it was in his possession. When he arrived in an alley, he dropped the gun. He was taken into custody by the police, and the police recovered

the gun. On cross-examination, he denied that he was holding the gun when Samuel Gayden was shot from behind and denied that he told the police upon his arrest that, "I got both of them."

¶ 30    In rebuttal, the State entered a certified copy of defendant's conviction and his violation of probation conviction. The State also proceeded by way of stipulation. It was stipulated that when Michael Slevnick, a private investigator employed by defense counsel, interviewed Ashana Brown, Ashana told him that she, defendant, and their baby spent the entire night on the porch, and she never saw a "tussle." It was further stipulated that Ashana Brown never told investigators from the Cook County State's Attorney's Office that she saw a "tussle" that night. The parties also stipulated that Jeffery Hyde was separately interviewed by Michael Slevnick and investigators from the Cook County State's Attorney's Office. Hyde told Slevnick that defendant was across the street in a vacant lot when the shooting occurred, and he never saw the police recover a handgun from the victim's car. Hyde told the investigators that he never saw the police recover a handgun from the victim's car.

¶ 31    The trial court conducted a jury instruction conference where the parties agreed to all of the proposed jury instructions with the exception of defendant's request to include a jury instruction defining "intent." The trial court denied defendant's request for this instruction. Following arguments, the jury returned a verdict finding defendant guilty of first degree murder of Demetrius Thomas, and aggravated battery with a firearm of Samuel Gayden.

¶ 32                        Post-trial Proceedings

¶ 33    On December 23, 2009, we affirmed defendant's conviction. *People v. Jonathan Brooks*, 1-07-1693 (2009) (unpublished order pursuant to Illinois Supreme Court Rule 23). After defendant's conviction was affirmed on direct appeal, on November 4, 2010, defendant filed a *pro se* postconviction petition. In that petition, he argued, *inter alia*, that he was denied a fair trial when

the trial court denied his request for jury instructions on second degree murder and involuntary manslaughter. He also argued that his appellate counsel was ineffective for failing to raise this issue on direct appeal. He further argued that his defense counsel was ineffective for failing to conduct an investigation and present sufficient mitigating evidence and witnesses at the sentencing hearing. On May 27, 2015, the Honorable Charles Burns granted the State's motion to dismiss in a written order.

¶ 34    After defendant appealed this decision, we issued on order on October 16, 2017, remanding this matter back to the circuit court for second-stage proceedings. We found that defendant's due process rights were violated when the circuit court dismissed his postconviction petition before he could respond to the State's motion to dismiss.

¶ 35    After remand, defendant filed a response to the State's motion to dismiss, and the Honorable Ursula Walowski issued an oral decision to grant the State's motion to dismiss and dismiss defendant's postconviction petition, on October 26, 2021. The court found that:

> "…I do not find that there was anything as far as ineffectiveness because there was [sic] jury instructions that were asked for as far as lessor included that was acknowledged. There were witnesses called by the defense in the trial. Various of these issues were ruled on already by the Trial Court and the Appellate Court so I do not see any valid issues here that we should proceed to support an evidentiary hearing because I don't find that as a whole even taking all of the allegations separately and putting them together, I still don't find that this leads to ineffective assistance of counsel and therefore I don't find that postconviction relief is proper here."

¶ 36                                    ANALYSIS

¶ 37　　　Defendant's claims on appeal relate to the denial of his right to both effective assistance of trial and effective assistance appellate counsels pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). The Act provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Hodges*, 234 Ill.2d 1, 9 (2009); *People v. Peeples*, 205 Ill.2d 480, 509 (2002). Here, the trial court reviewed defendant's postconviction petition at the second stage of postconviction proceedings. At this stage, counsel may be appointed to an indigent defendant (725 ILCS 5/122-4 (West 2008)), and the State, as respondent, enters the litigation (725 ILCS 5/122-5 (West 2008)). The circuit court must determine whether the petition and any accompanying documentation make "a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill.2d 239, 246 (2001) (citing *People v. Coleman*, 183 Ill.2d 366, 381 (1998)).

¶ 38　　　At this stage, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *People v. Pendleton*, 223 Ill. 458, 473 (2006). The court reviews the petition's factual sufficiency as well as its legal sufficiency considering the trial court record and appliable law. *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 22 (citing *People v. Alberts*, 383 Ill.App.3d 374, 377 (4th Dist. 2008)). If no such showing of a constitutional violation is made, the petition is dismissed. *Edwards*, 197 Ill.2d at 246. If, however, a substantial showing of a constitutional violation is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. *Id*; 725 ILCS 5/122-6 (West 2008).

¶ 39　　　Defendant asserts that his trial counsel was ineffective for failing to preserve several issues for appellate review, and his appellate counsel was ineffective for failing to properly raise these claims on direct appeal. Claims of ineffective assistance of counsel are resolved under the standard set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *People v. Rogers*, 197 Ill.2d 216, 223 (2001). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced the defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill.2d 142, 163 (2001). To show sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case can be disposed of on the ground of lack of sufficient prejudice, the court need not consider the quality of the attorney's performance. *Id*. at 697.

¶ 40 A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating that such failure was objectively unreasonable and prejudiced the defendant. *Rogers*, 197 Ill.2d at 223. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Simms*, 192 Ill.2d 348, 362 (2000). Thus, the inquiry as to prejudice requires the court to examine the merits of the underlying issue, for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal. *Id*. Appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *Rogers*, 197 Ill.2d at 223.

¶ 41                              **I. Failure to Request Jury Instructions**

¶ 42 Defendant contends that the circuit court erred in dismissing his postconviction petition at the second stage of postconviction proceedings where he made a substantial showing that his trial counsel provided ineffective assistance for failing to request a self-defense and second degree murder jury instructions, and his appellate counsel was ineffective for failing to raise this issue on direct appeal. To support his claim, defendant relies upon is own trial testimony and the testimony of his defense witnesses. He asks this court to remand for a new trial, as opposed to a third-stage evidentiary hearing. In turn, the State argues that defendant did not establish his claim where the evidence did not support a finding of self-defense and second-degree murder. Moreover, the State argues that even if this cause is remanded, it should be remanded for third-stage proceedings where there is a remaining factual question that can only be resolved by a third-stage hearing.

¶ 43 Initially, defendant contends that the circuit court erred when it based its decision to grant the State's motion to dismiss upon its finding that defense counsel was not ineffective. The circuit court found that defense counsel had indeed requested instructions for self-defense and second degree murder during defendant's trial. The record does not support the postconviction court's determination. The record shows that defense counsel only submitted a jury instruction to define "intent" for the jury and did not submit any instruction related to self-defense and second degree murder. Nevertheless, it is well-established that we review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *Pendleton*, 223 Ill.2d at 473. We review the circuit court's judgment and not its reasoning and may affirm for any reason in the record. *People v. Ringland*, 2015 IL App (3d) 130523, ¶ 33.

¶ 44 Jury instructions are intended to convey to the jury the correct principles of law applicable to the evidence submitted so that the jury can "'arrive at a correct conclusion according to the law and the evidence.'" *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40 (quoting *People v.*

*Pinkney*, 322 Ill.App.3d 707, 717 (1st Dist. 2000)). Both parties are entitled to have a jury instructed on their theories of the case and, generally, an instruction is warranted if there is even slight evidence to support it. *People v. Miller*, 2021 IL App (1st) 190060, ¶ 44 (citing *People v. Jones*, 175 Ill.2d 126, 131-32 (1997)).

¶ 45        Self-defense is an affirmative defense which claims that defendant was justified in the use of force. *People v. Lee*, 213 Ill.2d 218, 224-25 (2004). "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force." See Illinois Pattern Jury Instruction (IPI), Criminal, No. 24-25.06 (4th ed. 2000) A defendant is entitled to an instruction on self-defense where there is some evidence, even if very slight, in the record, which, if believed by the jury, would support the theory of self-defense. *People v. Washington*, 2012 IL 110283, ¶ 43. However, "[w]here self-defense is not supported by the evidence, an instruction thereon may properly be refused." *People v. Everette*, 141 Ill.2d 147, 157 (1990).

¶ 46        Moreover, a person commits the offense of second degree murder when he or she commits the offense of first degree murder, and he or she unreasonably believes that the time of the killing that the circumstances are such that, if they existed, they would justify or exonerate the killing. 720 ILCS 5/9-2(a)(2) (West 2010). Second degree murder is a lesser mitigated offense of first degree murder and not a lesser included offense of first degree murder. *People. v. Jeffries*, 164 Ill.2d 104, 122 (1995). The elements of first degree murder and second degree murder are identical. *Jeffries*, 164 Ill.2d at 122. It differs from first degree murder only because of the presence of a statutory mitigating factor. *Id.* at 122. Again, a defendant is entitled to a second degree murder instruction when "slight" evidence, which the jury could believe, supports it. *Everette*, 141 Ill.2d at 157. Therefore, to merit a jury instruction for self-defense or second degree murder, the evidence would

have had to show that defendant shot the two victims with either a reasonable or unreasonable fear of harm.

¶ 47        Here, there was no evidence to support a request for an instruction on self-defense and second degree murder. Defendant never testified, and did not otherwise present any evidence, showing that he shot the two victims.  Looking at defendant's own trial testimony, he testified that Samuel pulled out a gun while he and Samuel were tussling. Samuel was holding the gun in his left hand, but defendant was able to get the gun away from Samuel when defendant bit him in the wrist. During this tussle, the gun went off one time. On cross-examination, however, defendant testified that he did not shoot Samuel in the back of his arm, did not know who was holding the gun when Samuel was shot from behind, did not shoot Demetrius, and did not know when Demetrius was shot. Defendant's testimony that a shot was fired during a struggle with Samuel, in the absence of any admission by defendant that this gunshot was connected to the injuries suffered by Demetrius and Samuel, does not provide the necessary "some evidence" to support the inclusion of self-defense and second degree murder jury instructions.

¶ 48        Defense counsel's decision to not request instructions regarding self-defense and second degree murder amounted to trial strategy as it would have been inconsistent with defendant's own testimony as to how the shooting occurred. See *People v. Morrow*, 2013 IL App (1st) 121316-U.[1] In *Morrow*, the defendant was convicted of first degree murder after a shooting. At trial, the defendant testified that he denied shooting the victim and denied being present at the time of the shooting. In a successive postconviction petition, the defendant argued that his appellate counsel was ineffective for failing to argue on direct appeal that the defendant's trial counsel was ineffective for failing to request second degree murder instructions. We disagreed, stating, in part:

---

[1] This case is a published opinion but incorrectly labelled as an unpublished Rule 23 order.

"However, even if we determine that there was sufficient evidence to support a second-degree murder instruction, defense counsel may have concluded that a self-defense theory would have been incompatible with the theory presented, since it would require defendant to admit to the shootings. '[T]he decision of whether to submit an instruction on a lesser included offense is typically considered to be one of trial strategy that has no bearing on the competency of counsel because counsel could have reasonably believed that the instruction would have converted a likely acquittal into a likely conviction of the lesser crime.' [Citations] Here, defense counsel made the strategic decision to argue that the State failed to prove its case, and although defendant's trial counsel argument was ultimately unsuccessful, that 'does not mean counsel performed unreasonably and rendered ineffective assistance.' [Citation.]" (Internal quotation marks omitted.) *Morrow*, 2013 IL App (1st) 121316-U, ¶ 59.

¶ 49     It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill.App.3d 231, 267 (2007). "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence," and therefore, are "generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill.2d 361, 378 (2000). Therefore, we find that defendant failed to overcome the presumption that trial counsel's failure to request the jury instruction was trial strategy. Further, because there was no evidence to support either a self-defense instruction or second degree murder instruction, no prejudice can be shown.

¶ 50     Likewise, defendant's reliance upon the trial testimony of Jeffery Hyde, Ashana Brown, as well as the testimony of some other defense witnesses that they saw a police officer retrieve a

handgun from the black car, does not provide the necessary "some evidence" to support the inclusion of these two jury instructions. Both Jeffery Hyde and Ashana Brown testified that they saw a tussle and heard a gunshot, but neither of them was able to see who fired any of the gunshots and did not see that either of the victims were injured because of this gunshot. Moreover, defendant does not explain how the testimony from the defense witnesses that a police officer, who was described by some defense witnesses as Caucasian and others as African American, finding a handgun inside Demetrius' black car supports a self-defense or second degree murder instruction. In fact, defendant testified that as he ran away from the scene, he had possession of the handgun that was shown to have fired the bullet that killed Demetrius, fired the bullet recovered from the passenger seat of Demetrius' car, and fired the two cartridge casings recovered from the rear of Demetrius' car. The recovery of a handgun not shown to be related to the injuries suffered by the victims, would not provide the necessary "some evidence" for the jury instructions.

¶ 51    Defendant relies on *People v. Goods*, 2016 IL App (1st) 140511, as a case in which the defendant's conviction was reversed and remanded for failure to instruct on self-defense; suggesting that the circumstances of this case are "strikingly similar" circumstances to those here. We reject defendant's argument that the factual comparisons between these two cases support a finding that an instruction for self-defense and second degree murder should have been requested by trial counsel. As we previously found, here, defendant did not admit that he fired the shots that killed Demetrius and injured Samuel. In sharp contrast, in *Goods*, there was some evidence to support a self-defense jury instruction where the defendant admitted that he, along with a codefendant, shot the victim. *Goods*, 2016 IL App (1st) 140511, ¶ 48. Therefore, we find that defendant's reliance on *Goods* is misplaced.

¶ 52    Moreover, because we found that trial counsel did not render ineffective assistance by failing to request a self-defense and second degree jury instructions for defendant's first degree murder charge, we find that defendant has suffered no prejudice by appellate counsel failing to raise this as an issue on appeal. Therefore, we affirm the trial court's dismissal of defendant's postconviction petition on this issue.

¶ 53    Because we affirm the circuit court's decision to grant the State's motion to dismiss and dismiss defendant's postconviction petition, we need not consider defendant's request to remand directly for a new trial without first holding an evidentiary hearing. However, we recognize that defendant does not cite to any controlling authority providing for such a remedy. A reviewing court is entitled to have the issues before it clearly defined and is not simply a repository in which appellants may dump the burden of argument and research; an appellant's failure to properly present his own arguments can amount to waiver of those claims on appeal. *People v. Chatman*, 357 Ill.App.3d 695, 703 (1st Dist. 2005). Moreover, he does not recognize that, at the second stage of postconviction proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, whereas the purpose of the third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, is for the circuit court to hear evidence related to a defendant's claim and determine whether the evidence introduced demonstrates that the defendant is, in fact, entitled to relief. *People v. Pendleton*, 223 Ill.2d 458, 473 (2006). "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation omitted] is a measure of the legal sufficiency of the petition's well-pleaded allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 54    Therefore, we affirm the court's second-stage dismissal of defendant's postconviction petition relating to the failure to include the second degree and self-defense jury instructions.

¶ 55              **B. Failure to Present Witness Testimony at Sentencing Hearing**

¶ 56    Defendant argues that his trial counsel was ineffective for failing to present the testimony of available mitigation witnesses at the sentencing hearing as a result of defendant's refusal to succumb to trial counsel's demand for more money to present these witnesses. Defendant further contends that his sixth amendment right to effective assistance was also violated by the existence of an actual conflict of interest when he alleged that his trial counsel refused to conduct a pre-sentence investigation unless defendant paid him more money.

¶ 57    In arguing that we should affirm the second-stage dismissal of his postconviction petition, the State initially argues that defendant forfeited his claim of a conflict of interest where he failed to raise it in either his *pro se* postconviction petition or in his supplemental postconviction petition. Substantively, the State contends that defendant cannot establish the prejudice prong of *Strickland* where he could not establish that, but for counsel's alleged incompetence, defendant stood a reasonable chance of achieving a better result because trial counsel was able to successfully argue for a significantly lesser sentence than requested by the State. The State further argues that defendant also cannot establish the prejudice prong of an actual conflict of interest where the record belies any claim that counsel's performance was adversely affected.

¶ 58    Initially, we find that defendant preserved his claim that he was deprived of effective assistance of trial counsel where there was a conflict of interest. The Act specifies that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2016). "This court lacks the authority to excuse an appellate forfeiture caused by the failure of a litigant to include issues in his or her postconviction petition.

*People v. Reed*, 2014 IL App (1st) 122610, ¶ 43 (citing *People v. Jones*, 213 Ill.2d 498, 507-08 (2004)); see also *People v. Ligon*, 392 Ill.App.3d 988, 996 (2009) (by failing to raise ineffective assistance of counsel arguments in his *pro se* postconviction petition, "the defendant has waived them, and this court does not have authority to excuse that waiver."). "Our supreme court***has indicated that this court is not free to consider claims raised for the first time on appeal from the dismissal of a postconviction petition." *Reed*, 2014 IL App (1st) 122610, ¶ 55 (citing *People v. Pendleton*, 223 Ill.2d 458, 475 (2006)). In fact, "[o]ur supreme court has criticized this court more than once for inappropriately overlooking the waiver provision of the Act" and addressing claims for the first time on appeal." *Jones*, 213 Ill.2d at 505-506 Accordingly, we may not excuse a defendant's forfeiture when he argues on appeal a contention not made in his postconviction petition.

¶ 59      We recognize that we must liberally construe defendant's petition in determining whether the defendant made a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill.2d 324, 334 (2005) (citing *People v. Coleman*, 183 Ill.2d 366, 382 (1998)). We must also view defendant's petition with a lenient eye, allowing borderline cases to proceed. *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32 (citing *People v. Mescall*, 403 Ill.App.3d 956, 962 (2d Dist. 2010).

¶ 60      Defendant's postconviction petition, as well as his supplemental petition, do not contain the phrase "conflict of interest. In his *pro se* petition, defendant alleged that he was "denied the right to effective assistance of Trial [sic] counsel guaranteed by the 6th and 14th Amendments of the United States Constitution, and Article 1 § 8 of the Illinois Constitution where defense counsel [] failed to conduct an investigation and present sufficient mitigating evidence and witnesses at Petitioner's sentencing hearing." In the supplemental postconviction petition, postconviction counsel did not seek to amend this claim.

¶ 61    However, in support of his *pro se* petition, defendant submitted an affidavit in which he averred that, after the guilty verdict, he told defense counsel that he had family members and friends who wanted to testify or provide a letter at the sentencing hearing. According to defendant, defense counsel "responded angrily, 'Your people have embarrassed me enough, if you want me to present witnesses or do any other work for you then pay me more money, because the judge is not going to consider anything that your family or I say." Defendant attached the affidavits of 14 different people who attested that they were willing to testify or provide a letter on defendant's behalf. In some of these affidavits, the affiants averred that they were never contacted by defense counsel. Defendant pointed out that, at the sentencing hearing, defense counsel stated that he did not wish to present any evidence or testimony.

¶ 62    We find that there was enough to preserve the issue of a conflict of interest. Even though defendant's petitions did not identify his claim as a conflict of interest, the information that he alleged in his affidavit was sufficient to outline this particular claim. Specifically, he alleged that when he told defense counsel that there were available witnesses for the sentencing hearing, defense counsel demanded more money, and he attached the affidavits of these witnesses who averred that defense counsel did not contact them. Consequently, we find that defendant did not forfeit this issue. Therefore, we address both claims raised by defendant related to the presentation of witnesses at the sentencing hearing.

¶ 63    As to defendant's contention that his counsel was ineffective for failing to investigate and present the testimony of witnesses at the sentencing hearing, we apply the two-prong test outlined in *Strickland* to defendant's claim. *People v. Jackson*, 149 Ill.2d 540, 553 (1992) Regarding the first prong of this test, any allegation of incompetency arising from a matter of tactics or strategy will not support a claim of ineffective representation. *People v. Shum*, 117 Ill.2d 317, 370 (1987).

As our supreme court has recognized, "the failure to offer evidence in mitigation of sentence does not, in and of itself, demonstrate incompetence." *Shum*, 117 Ill.2d at 370; *People v. Orange*, 168 Ill.2d 138, 167-168 (1995). Moreover, "a competent attorney may decide, in an appropriate case, to forego presenting mitigating evidence and, instead, plead for mercy." *People v. Caballero*, 126 Ill.2d 248, 274-75 (1989). Furthermore, "'[e]ven where counsel's performance is deficient due to the failure to investigate mitigating evidence and present it to the [fact finder], the defendant must still demonstrate prejudice to sustain a claim.'" *People v. Simon*, 2014 IL App (1st) 130567, ¶ 71 (quoting *People v. Pulliam*, 206 Ill.2d 218, 239 (2002).

¶ 64        In support of this case, defendant attached fourteen affidavits from family members and friends who averred to defendant's good character. However, we recognize that only seven of the fourteen affiants averred that defense counsel never spoke to them. The affidavits of the other seven affiants are silent as to whether counsel spoke to them about their testimony.

¶ 65        In these affidavits in which the affiants averred that defense counsel never spoke to them, the family members and friends described defendant as a loving, family-oriented person who was raised by a single mother. First, most of what was presented in these affidavits is contained in the presentence investigation report that the trial court considered in determining defendant's sentence. See *Simon*, 2014 IL App (1st) 130567 (the defendant cannot establish prejudice where the same information was contained in the presentence investigation report so it would have been cumulative); *People v. Jackson*, 200 Ill.App.3d 92, 101 (2d 1990). The presentence investigation report similarly highlighted his family background and his educational history, including the fact that he had subsequently obtained a G.E.D. At the sentencing hearing, defense counsel argued, in mitigation, that defendant was raised by a single mother and had done the best she could under these circumstances and rebutted the State's suggestion that defendant did not support his children.

Defense counsel emphasized that defendant had obtained his G.E.D. after dropping out of high school from being the victim of a gunshot.

¶ 66        As we have also recognized, "'we must access prejudice in a realistic manner based on the totality of the evidence. Although it is improper to focus solely on the potential mitigating evidence.'" *Simon*, 2014 IL App (1st) 130567, ¶ 72 (quoting *People v. Coleman*, 168 Ill.2d 509, 538 (1995). Here, the trial court focused on defendant's criminal history, the fact that he was repeatedly sentenced to probation for these prior offenses, and the seriousness of the offense. Defendant's criminal history as a juvenile and as an adult included three different adjudications and convictions for possession of a controlled substance, as well as a conviction for domestic battery. Defendant also had two convictions in Iowa for criminal mischief in fifth degree and domestic abuse and assault. Defendant had repeatedly been sentenced to probation for these offenses, and he was found to have repeatedly violated the terms of his probation. In sentencing defendant, the trial court relied heavily on defendant's criminal history and, referring to defendant being sentenced to probation for these offenses, the trial court found that "[h]e was given special consideration every step of the way." The trial court also found that the shooting of "two innocent victims who happened to be there visiting a relative or a friend. It's senseless, its abhorrent, it needs to be punished to the full extent of the law." We do not believe that the additional mitigating facts that his family members and friends wished to offer would have affected his 65-year sentence, which was substantially below the life imprisonment maximum and much closer to the mandatory minimum sentence of 51 years' imprisonment. Second, the testimony of defendant's close family members "would not be overly persuasive mitigation witnesses as their bias towards defendant would be obvious." *Id*. at 101. Under these circumstances, where the value of the proposed mitigating evidence when compared to that already presented and the seriousness of the offense,

did not show that there was a reasonable probability that this evidence would have influenced the court at sentencing.

¶ 67     We next address defendant's contention that there was a conflict of interest for defense counsel's refusal to investigate and present mitigation evidence unless defendant paid him more money. A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Fields*, 2012 IL 112438, ¶ 17; *People v. Spreitzer*, 123 Ill.2d 1, 13 (1988) ("Effective assistance means assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations."). "The prohibition against conflicts of interest is based on the principle that 'no man can serve two masters.'" *Spreitzer*, 123 Ill.2d at 13.

¶ 68     There are two categories of conflicts under Illinois law. The first category concerns "per se" conflicts. *Id.* at 14. A "per se" conflict exists when "certain facts about a defense attorney's status," standing alone, "engender[s] a disabling conflict." *Id.* Under such circumstances, appearances are enough, "there is no need to show that the attorney's actual performance was in any way affected by the existence of the conflict." *Id.* at 15. Prejudice is presumed in those rare instances because the defendant's lawyer "had a tie to a person or entity – either counsel's client, employer, or own previous commitments – which would benefit from an unfavorable verdict for the defendant." *Id.* at 16.

¶ 69     The second conflict includes everything that does not qualify as a *per se* conflict. *Id.* at 17. When a defendant alleges the existence of a non-*per se* conflict, as defendant has in this case, the analysis we employ depends on whether the circuit court was ever informed of the potential conflict. *Id.* at 17-18. Here, the circuit court was never informed about a potential non-*per se* conflict. "[I]f the trial court is not apprised of the potential conflict, then reversal of the conviction

will only be had upon a showing that 'an actual conflict of interest adversely affected' counsel's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). "What this means is that the defendant must point to some specific defect in his counsel's strategy, tactics, or decision marking attributable to the conflict." *Spreitzer*, 123 Ill.2d at 18. In other words, for a defendant to prove that an actual conflict of interest existed, he must prove that the conflict adversely affected his lawyer's performance. *People v. Taylor*, 237 Ill.2d 356, 376 (2010). Further, mere speculations or conclusions are not sufficient to establish that an actual conflict of interest affected counsel's performance. *People v. Williams*, 139 Ill.2d 1, 12 (1990).

¶ 70    After reviewing the record and viewing the evidence presented in the petition as truthful, we conclude that the circuit court properly dismissed defendant's conflict-of-interest claim where defendant failed make a substantial showing in identifying any "defect in his counsel's strategy, tactics, or decision making attributable to the alleged conflict of interest." *Spreitzer*, 123 Ill.2d at 18. Defendant claims that, due to the conflict that existed between his defense counsel and defendant, his defense counsel failed to investigate and present the testimony of witnesses in mitigation at the sentencing hearing. His argument is based exclusively on his claim that, had his defense counsel conducted a proper investigation, counsel would have discovered the witnesses whose affidavits were attached to his postconviction petition.

¶ 71    Defendant does not direct this court to anything in the trial proceedings, and we do not find anything in the record to otherwise support defendant's claim. However, as we have already determined, the inclusion of these witnesses as mitigation testimony would have been cumulative to evidence included in the pre-sentence investigation report, defense counsel argued these same points in asking for a lesser sentence, and the trial court extensively relied upon defendant's prior criminal history and the seriousness of the crimes committed by defendant.

¶ 72    We also consider that defense counsel continued to zealously represent defendant in the post-trial proceedings, regardless of whether counsel received any more money. See Illinois Rule of Professional Conduct 1.3 [1] [4] (2010) (providing that a lawyer should pursue the matter with zeal, commitment, and dedication to the interests of the client unless the representation is terminated). Counsel filed a post-trial motion a new trial, argued and disputed the State's argument in aggravation asking for the trial court to sentence defendant to life imprisonment. Defense counsel also filed a motion to reconsider sentence as well as a timely notice of appeal. Such vigorous representation by defense counsel belies a claim of an actual conflict of interest. Unlike the case of *People v. Falls*, 235 Ill.App.3d 558, 563 (1st Dist. 1992), relied on by defendant, where counsel stated he could not concentrate and give his best to his client because his client owed him money, there is nothing in the record in the instant case to suggest that defense counsel did not give the case his full attention or that he would not represent defendant to the best of his abilities. Thus, the record fails to establish that trial counsel labored under an actual conflict of interest at sentencing based on any issue with fees with defense counsel and, consequently, defendant did not make a substantial showing in order to merit further postconviction proceedings.

¶ 73    Defendant also posits that defense counsel's request for more money prior to the sentencing hearing was connected to his pending disciplinary proceedings before the Attorney Registration and Disciplinary Commission. Defendant relies upon the fact that his postconviction counsel attached the ARDC disciplinary records of his trial counsel. Defendant suggests that the ARDC records "shows [trial counsel's] client trust account was overdrawn at the time he attempted to extort additional money from [defendant]." However, postconviction counsel never referenced these records to claim that it was connected to an alleged attempt to extort money from defendant. Instead, postconviction counsel's sole reference to these records in the supplemental petition was

to suggest that trial counsel "had quite the history with the [ARDC]." Counsel never referenced these records in support of a claim that his trial counsel operated under a conflict of interest. As such, the presence of these records does not support the preservation of his claim that there was a conflict of interest. Moreover, the record does not support that there was any connection between the conduct alleged in this case and the status of his client trust account. Again, mere speculations or conclusions are not sufficient to establish that an actual conflict of interest affected counsel's performance. *People v. Williams*, 139 Ill.2d 1, 12 (1990).

¶ 74    Because we find that defendant's reliance upon defense counsel's performance at the sentencing hearing did not amount to a defect in defense counsel's strategy, tactics, or decision making, it follows that defendant has failed to point to a defect attributable to the alleged conflict of interest. See *Spreitzer*, 123 Ill.2d at 18. Accordingly, we find that defendant's postconviction petition was properly dismissed at the second stage of postconviction proceedings.

¶ 75                                    CONCLUSION

¶ 76    For the foregoing reasons, we affirm the second-stage dismissal of defendant's postconviction petition.

¶ 77    Affirmed.